[Civ. No. 3784. Fourth Dist. June 7, 1949.]

WESTERN GULF OIL COMPANY (a Corporation), Plaintiff and Appellant, v. TITLE INSURANCE AND TRUST COMPANY (a Corporation), Defendant and Appellant.

J. G. Leovy, P. O. Broxon and Borton, Petrini, Conron & Borton for Plaintiff and Appellant.

Robert Wannamaker, John W. Holmes and Jack W. Bradley for Defendant and Appellant.

MUSSELL, J.—This is an action for declaratory relief under an oil and gas lease and to require lessor to pay the cost of dehydrating oil.

In this proceeding plaintiff seeks declaratory relief to determine the rights and duties of the lessor and lessee with respect to the dehydration or cleaning of the oil produced under an oil and gas lease executed by plaintiff's predecessor, as lessee, with the predecessor of defendant as lessor of premises in the Fruitvale Oil Field in Kern County, and to recover from defendant lessor the cost of dehydrating lessor's royalty share of said oil.

The lease provides in part that, ''Lessee shall pay Lessor as royalty the equal one-eighth part of the value of all oil removed from the leased premises, after making the customary deduction for temperature, water, and b. s., at the posted market price in the district in which the premises are located for oil of like gravity the day the oil is run into pipe line or storage tanks, . . . or at Lessor's option exercised not oftener than once in any one calendar year upon sixty (60) days' previous written notice, deliver unto Lessor's tanks on the leased premises or at mouth of well to pipe line designated by Lessor, free of cost, Lessor's one-eighth part of said oil.'' At all times since the execution of the lease defendant elected to take its one-eighth royalty share of the oil produced from the premises in cash rather than in kind.

The lease does not contain any covenant referring to the cost of dehydration or the burden of dehydrating the lessor's royalty share of the oil, and the only prices posted for oil in the field in which the leased land is situated are, and have been, prices for ''clean'' oil, that is, oil containing a 3 per cent or less by volume of water and base sediment. Production

of oil from the leased premises commenced in 1934, and all oil so produced was "wet" oil, that is oil containing in excess of 3 per cent by volume, of water and base sediment.

Prior to July, 1943, the wet oil produced from the leased land was transported therefrom by plaintiff by means of pipe lines to field storage tanks of plaintiff on other property where it was commingled with other oil produced by plaintiff in the same field, and such of the commingled oil as required cleaning was thereafter dehydrated at a central dehydrator. No record was kept of the amount of lessor's oil which was dehydrated prior to July 1, 1943, as it was mixed with oil from other leases before dehydration and the resultant mixture was only dehydrated when necessary to reduce it to clean oil. Dehydration of wet oil in the instant case was accomplished by settling, and heat treatment to "break out" the water and base sediment to reduce the water content and base sediment to 3 per cent or less. From 1934, to July 1, 1943, the amount of net oil content, of oil for the purpose of accounting to the defendant for royalty interests was determined by means of tests of samples of wet oil taken from the tanks. These samples were taken from the top, middle, and bottom of each tank, mixed together, put with solvent in centrifuges and broken down to determine the percentage of water and base sediment, or amount of cut. When the amount of cut was thus determined a deduction was made from the gauges of the tank after a correction for temperature and the result was the net quantity of oil.

On November 12, 1942, Mr. Robert Wannamaker, as attorney for certain beneficiaries under the trust involved, sent to plaintiff a copy of a report of engineers retained by him, in which report it was recommended that the oil from the leased premises be first cleaned and dehydrated thereon, prior to being gauged, sampled and tested for the final royalty accounting. Plaintiff then erected and constructed on the leased property a plant designed to dehydrate or clean exclusively the oil produced therefrom.

This plant was put in operation July 1, 1943, and substantially all oil produced from defendant's land was thereafter dehydrated or cleaned in the plant and plaintiff accounted to defendant for its royalty share on the basis of the actual quantity of clean oil produced from the property and cleaned in the plant.

In the month of January, 1944, plaintiff deducted from royalties payable to defendant the sum of $674.11 as plain-

tiff's share of the cost of dehydrating oil produced from the premises from July 1, 1943, to December 31, 1943. During the first four months of 1944, plaintiff deducted from royalty payments to defendant sums aggregating $537.48 as the cost to plaintiff of dehydrating defendant's royalty share of oil removed from the leased premises and dehydrated during that time.

On April 11, 1944, plaintiff received from defendant a written notice wherein it was stated that the lease had been violated and breached by plaintiff by reason of the withholding of cleaning charges from the royalty payments for the period beginning July, 1943, to and including February, 1944. Plaintiff was required by the notice to "cease the violation and breach within 60 days."

On June 2, 1944, plaintiff sent a check to defendant for the sum of $1,211.59, representing the total deductions made during the period July 1, 1943, to April 30, 1944, inclusive, for lessor's portion of the cost of dehydrating and cleaning the oil produced under the lease. Defendant was notified by plaintiff in the letter which accompanied the check that the payment was made solely to avoid a possible forfeiture of the lease by reason of the service of the notice of breach and to "cease violation," and that payment was made without any admission that the lessor's royalty oil was not properly chargeable with its proportion of the cost of dehydrating or cleaning the oil produced from the leased property.

On June 9, 1944, defendant wrote plaintiff advising it that defendant could not accept the tender if it was made subject to assent or acquiescence in the provisions of the letter accompanying the tender, and under date of June 10, 1944, plaintiff replied that the tender was not subject to assent or acquiescence in the deductions or statements in plaintiff's letter. Thereupon the check was accepted and payment thereon was received by defendant. In the royalty statements for the month of May, June and July, 1944, which statements and checks were submitted the month following the statement period, no deduction was in fact made from royalty payable during each of these months, although each of the statements sets forth a "cleaning charge" at the rate of three cents per barrel, and one-eighth thereof is shown as a charge, viz., for the month of May, $179.54, June, $183.70, and July, $231.84. The July statement and check in payment thereof was accompanied by plaintiff's letter of August, 1944, in which letter, among other things, plaintiff advised defendant that it was

about to file an action against defendant and that the payments ''will be made without prejudice to Western Gulf Company's right to make deductions of such costs from said royalties . . .'' On August 21, 1944, defendant refused to accept the tender and so advised plaintiff, and on August 23, 1944, plaintiff advised defendant that the tender was not subject to any conditions or acquiscence referred to in plaintiff's letter of tender and defendant thereupon accepted the payment.

It was stipulated that the total cost of dehydrating one-eighth of the oil produced on the leased premises from July 1, 1943, to July 31, 1944, was the sum of $1,806.67 and the recovery of that sum is sought by plaintiff.

Pursuant to a stipulation of the parties there was first submitted to the trial court the question of whether, under the terms of the lease, defendant was obligated to pay a proportionate share of the costs of dehydration, which question was decided in favor of plaintiff. Upon a further hearing of the cause upon the question as to whether plaintiff was entitled to recover such costs during the period July 1, 1943, to July 31, 1944, the court determined that said costs were voluntarily paid by plaintiff to defendant and could not be recovered.

The judgment decrees that during such time as the defendant elects or has elected to be paid in cash for its royalty share of the oil produced from the leased premises, plaintiff has the right to charge lessor one-eighth of the cost of dehydrating oil produced on the leased premises; that such cost, during the period July 1, 1943, to July 31, 1944, was voluntarily paid by plaintiff and was not recoverable; that the lessee is not estopped or barred by laches and is entitled to its costs.

Plaintiff appeals from that part of the judgment holding that the dehydrating charges for the period stated were voluntarily paid and not recoverable, and defendant appeals from the remaining provisions of the judgment.

The principal question for our consideration is whether, under the circumstances present in the instant case, the lessor, or the lessee, is obligated to pay the cost of dehydration of the lessor's oil produced from the leased premises.

The matter involved here was passed upon by this court in *Vedder Pet. Corp.* v. *Lambert etc. Co.*, 50 Cal.App.2d 102 [122 P.2d 600], which was an action for declaratory relief, brought by the lessee to determine the rights and duties of the parties under an oil and. gas lease almost identical in

terms with the one here in question. This court held "that the value of all oil produced and saved from wells," etc., as used in the royalty clause of the lease, was the value of the crude oil as it was produced from the mouth of the wells and in that connection we said, page 109, "If there were a posted available market price in the district where the premises are located for oil of like gravity, the day the oil is run into the purchaser's pipe line or storage tanks, that would be its value for the purpose of determining the amount of cash royalty to be paid, but where, as in this case there is no posted price in the district where the premises are located, then the value must necessarily be its actual market value or, in other words, its selling price in the market."

In discussing the meaning of the provision, "the day the oil is run into the purchaser's pipe line or storage tanks," as used in the royalty clause of the lease, this court held that the quoted provision was intended to fix the time as of which the value of the oil should be determined and was not intended to refer to the condition of the oil. In the instant case the lessor had an option to require the lessee to "deliver into Lessor's tanks on the leased premises or at the mouth of well to pipe line designated by Lessor, free of cost, Lessor's one-eighth part of said oil." This provision clearly indicates that the parties did not intend that the lessee should be required to dehydrate lessor's share of the oil before delivering it, in the event that lessor chose to exercise the option to have its royalty share in oil delivered at lessor's tanks or at the "mouth of well to pipe line designated by lessor." Under the terms of the lease, lessor could not require lessee to dehydrate or clean the oil before delivery of its royalty share in kind. As we held in the Vedder case (*supra*, p. 110) the lessor should either pay its proportionate share of the dehydrating expense or should elect to receive its royalty share of the oil in kind, in its crude state, as produced from the wells. Since lessee is not bound to dehydrate lessor's royalty oil when delivered in kind, there is no duty upon lessee to dehydrate or clean it when the lessor's proportionate share of the value thereof is to be paid in cash.

We conclude that since lessor has elected to receive its royalty share in cash it must bear its proportionate share of the cost of dehydration of the oil produced. In *Alamitos Land Co. v. Shell Oil Co.*, 3 Cal.2d 396 [44 P.2d 573], the court, when considering the duty of parties to a lease to clean wet oil, said, at page 402:

"It will be noted that the lease is silent both as to how the quality and how the quantity tests shall be made. Likewise, the lease fails to require defendant to prepare the royalty oil for pipe-line shipment in the event it is delivered in kind. To provide tanks for the storage of plaintiff's royalty oil is the only express obligation imposed. If delivery in kind is made, it is to be as produced and saved or as produced and stored in tanks on the premises. If this means a delivery of the gross fluid as produced, it certainly follows that, if required to purchase it, defendant must pay its own current price for the same substance. If the duty to theoretically clean is absent when the royalty oil is delivered in kind, it is absent when the royalty oil is to be purchased."

Defendant, in comparing the case at bar with the Vedder case, *supra*, admits that the royalty clauses in the leases in both cases are substantially the same and states that in the Vedder case there was no posted price for oil in the field in which the leased property was situated, while in the case at bar there was a posted price in the Fruitvale district. The statement is correct, but the evidence before us indicates that the oil as produced from the wells in question was wet oil and not marketable, except at occasional intervals, and then only in small quantities and at a discount substantially in excess of the cost of dehydration. The only prices in the Fruitvale district were prices for clean oil, and dehydration was necessary to prepare the oil for sale. The testimony is that the gravity of the oil produced from the leased premises has never been of any consequences in estimating its value for marketability because of the market price structure, which, except for a short time, about three months in 1941, was all one price for all gravities. As in the Vedder case there is no posted market price for the oil as it is produced from the premises and the lessee is entitled to deduct the cost of preparing lessor's share of oil for the market. Such services are for the benefit of lessor.

Defendant insists that lessee is barred by its laches by reason of the fact that no charge for dehydration was made by lessee for the first 10 years of production. We can see no merit in this contention. During this 10-year period wet oil was accounted for as it was removed from the premises, the net quantity was determined by sampling. The oil was commingled with that from other premises and lost its identity. It was impossible to determine the quantity of lessor's oil which was dehydrated. It follows that no accurate charge

for cleaning it could have been made by plaintiff. After the dehydration plant was put in operation the method of accounting was changed and, as suggested in the engineer's report, inaccuracies in sampling and accounting were eliminated. The trial court found that the parties to the lease, or other respective successors in interest did not construe or interpret the terms or provisions of said lease as requiring the payment of royalty without any charge or deduction for dehydration. There is substantial evidence to support this finding.

It is argued by defendant that custom existing at the time of the execution of the lease is determinative of the question as to who should bear the cost of dehydration where the lease is ambiguous in that respect. In this connection the trial court found, on conflicting evidence, that no custom or practice with reference to dehydration of royalty oil by the lessee or oil operators, without charge therefor, existed in the area involved. This finding finds support in the evidence and cannot be here disturbed.

Plaintiff contends in its appeal that the court erred in finding that ''the said sum of $1,211.59 paid by plaintiff to defendant on or about June 2, 1944, was freely and voluntarily paid by plaintiff and constituted a voluntary payment and plaintiff waived all right to recover any part thereof.''

From an examination of the letters accompanying the payments, commencing with plaintiff's letter of June 2, 1944, together with the replies sent by defendant, it is apparent that plaintiff was endeavoring to make its payments subject to conditions and reservations which were not acceptable to defendant. The payments were finally made and accepted without any conditions or reservations, and the trial court's finding was sufficiently supported by the evidence. Payments of illegal claims enforced by duress, coercion or compulsion, when the payor has no other adequate remedy to avoid it, will be deemed to have been made involuntarily and may be recovered, but the payment must have been enforced by coercion and there must have been no other adequate means available to prevent the loss. (*Texas Co.* v. *Todd,* 19 Cal. App.2d 174, 188 [64 P.2d 1180].)

Plaintiff could have commenced action immediately under the provisions of 1060 of the Code of Civil Procedure, asking for temporary relief from forfeiture of the lease until the matter was finally determined. Instead, plaintiff chose to pay the disputed amount, thus removing the grounds for pos-

sible forfeiture of the lease, and delayed commencement of the action some 208 days. Moreover there was evidence from which the trial court could infer that the payments were made to avoid litigation until such time as plaintiff elected to commence action. ■ Payments voluntarily made, with knowledge of the facts, cannot be recovered. (*Holt* v. *Thomas,* 105 Cal. 273 [38 P. 891].) The general rule as to payments made under duress is stated in *Young* v. *Hoagland,* 212 Cal. 426, 431 [208 P. 996, 75 A.L.R. 654], in the following language:

"It has been stated that the general rule with regard to duress of this character is that where, by reason of the peculiar facts a reasonably prudent man finds that in order to preserve his property or protect his business interests it is necessary to make a payment of money which he does not owe and which in equity and good conscience the receiver should not retain, he may recover it. (21 R.C.L., pp. 154, 155.)"

■ Whether the plaintiff, through its agents or representatives, acted as a reasonably prudent person, depends upon the facts and circumstances and is a question for the trial court's determination. (*Young* v. *Hoagland, supra,* pp. 431, 432.)

The judgment is affirmed. Each party to pay its own costs on appeal.

Barnard, P. J., and Griffin, J., concurred.

A petition for a rehearing was denied July 1, 1949, and defendant and appellant's petition for a hearing by the Supreme Court was denied August 4, 1949.