[No. D039932. Fourth Dist., Div. One. July 7, 2003.]

JOSEPH TARPY, Plaintiff and Appellant, v.
COUNTY OF SAN DIEGO et al., Defendants and Respondents.

COUNSEL

Blumberg Lorber Nelson, Ronald H. Blumberg and Robyn Ranke for Plaintiff and Appellant.

John J. Sansone, County Counsel, Miriam E. Brewster and Deborah A. McCarthy, Deputy County Counsel, for Defendants and Respondents County of San Diego, Dawn Danielson, Jill Jones, Regina Jones, Michael Wix and Lori Brown.

Wallace & Schwartz and George M. Wallace for Defendants and Respondents Otay Lakes Veterinary Clinic, Keith Hilinski and Diana Lynn Jones.

OPINION

McINTYRE, J.—Joseph Tarpy brought this action against the County of San Diego (the County and collectively with its representatives, the County defendants) and the Otay Lakes Veterinary Clinic (the Clinic and collectively with its representatives, the Veterinary defendants) after his dog died from complications of a spay procedure. He appeals the granting of the County defendants' motion for summary judgment based on a finding that those defendants are immune from suit under Food and Agricultural Code section 30804.7, contending that the immunity language of the statute resulted from legislative oversight. (All statutory references are to this code unless otherwise specified.) He also appeals the granting of summary judgment in favor of the Veterinary defendants based on a written release of liability he signed prior to the operation, contending that he signed the release under duress.

We agree with Tarpy's contention that the statutory immunity provision does not render the County defendants immune from suit or liability, but conclude that his challenges to the validity of his release of liability are unavailing. Because the release is equally applicable to the County defendants, we affirm the judgment in its entirety on that basis.

FACTUAL AND PROCEDURAL BACKGROUND

In September 2000, the San Diego County Department of Animal Control (Department) impounded Tarpy's dog, Luke, after receiving a complaint from

the Jamacha Elementary School that Luke was running loose on school grounds. A little over a month later, the Department impounded Luke again after receiving a similar call from the school. Luke was not wearing an identification tag on either occasion and had not been neutered.

On the second occasion, Tarpy's father flagged down Officer Michael Wix as he was transporting Luke to the County's South County Animal Shelter. Officer Wix told Tarpy's father that the impact fee to retrieve Luke was $120; there is a conflict in the evidence as to whether Officer Wix disclosed that Tarpy's father would also have to pay a $45 second im pound fee. (It is uncontroverted, however, that Officer Wix forgot to disclose that he would also have to pay a $40 neuter deposit fee.) Tarpy's father was willing to pay what he believed was a $120 fee, but Officer Wix encouraged him to claim Luke from the animal shelter for $45; Officer Wix neglected to mention, however, that Luke would only qualify for the reduced fee if Tarpy agreed to let the Department have Luke neutered.

The next day, Tarpy went to the South County Animal Shelter to claim Luke and became upset when he learned that the actual fee to reclaim Luke was $211 (which included the fees described above and a $6 boarding fee). Although his father had given him a blank check, Tarpy indicated that he could not pay the fee because of his pending divorce and financial problems. Tarpy discussed the fees with a shelter supervisor, who indicated that if he was unwilling to pay the $211, he could (1) agree to have Luke neutered in the County's voluntary spaying and neutering program (SNIP) and pay a $60 fee or (2) choose not to claim Luke, in which case the County would attempt to find another home for Luke or, failing that, would have Luke euthanized. It is unclear whether Tarpy was told that he could pay the fees by credit card, although there were signs posted indicating that the Department accepted credit card payments.

Tarpy stated unequivocally that he did not want to have Luke neutered. After the supervisor told Tarpy he was ineligible to pay the fees in installments because Luke had been impounded once before and was still not neutered and that he could not take Luke to his own veterinarian to have the neutering performed without paying the $211, Tarpy stormed out of her office. The supervisor followed Tarpy and asked him whether he was relinquishing the dog. Tarpy responded that he was not and ultimately agreed to have Luke neutered "because he felt he had no other choice."

Shelter staff told Tarpy that to have Luke neutered, he would have to sign a "Notice, Waiver, Indemnification and Release From Liability Form," which provided:

"The spay/neuter or other surgery is performed under accepted standards of practice in the veterinary profession. However, I understand that, as with any medical procedure, complications or unexpected difficulties may arise during or after the surgery. I understand that these complications may include excessive bleeding, infection and in some cases, death. I also understand that animals with certain pre-existing conditions may involve a greater surgical risk to the animal. I further understand that I am not entitled to any waiver or refund of Department fees.

"I agree to waive and release the Department of Animal Control and the County of San Diego and its officers, agents, and employees, from and against any and all claims, cost liabilities, expenses, or judgments, including attorney's fees and court costs arising from the surgery, and hereby agree to fully indemnify and hold harmless the County of San Diego, from and against any and all such claims. I understand and agree that by signing this waiver I am freeing the County of San Diego, its employees, officers, or agents from any liability resulting or arising from such surgery.

"I understand that this waiver will be used against me and anyone else claiming damages in any legal action arising from the surgery. I also understand that no employee or agent is authorized to modify this waiver. I have personally read and understand this document."

Tarpy initially refused to sign the release form and said that if anything happened to Luke, he would sue the County. After the staff member insisted that a signed form was a condition of getting Luke neutered, Tarpy complied, but added a handwritten notation beside his signature indicating that he signed the form "under duress."

Pursuant to an agreement with the Department, a Clinic veterinarian performed the neuter procedure. Thereafter, the Clinic returned Luke to the South County Animal Shelter to recover. As a result of a loose suture, Luke suffered from internal bleeding and died by the following morning.

Tarpy filed this action against the County (also sued as the San Diego County Department of Animal Control), and its representatives Dawn Danielson, Jill Jones, Regina Jones, Michael Wix and Lori Brown, and the Clinic, Keith Hilinski, D.V.M. and Diana Lynn Jones, D.V.M. His complaint asserted a number of claims, including breach of duties as a depositary resulting in wrongful death, willful injury to an animal, negligence per se, veterinary malpractice, trespass to chattel, conversion, government tort liability and negligence. The County defendants moved for summary judgment on the ground that they were immune from liability under section 30804.7, subdivision (d) and based on Tarpy's written release. The Veterinary

defendants also sought summary judgment based on the release. The court granted both motions and entered judgment in favor of the defendants.

## DISCUSSION

1. *Immunity under Section 30804.7*

■ Section 30804.7 establishes mandatory fines for impounded dogs that are not spayed or neutered and specifies that funds collected from the fines are to be expended for humane education, programs for low-cost spaying and neutering of dogs and additional costs incurred by the public animal control shelter in the administration of the requirements of the statutes governing the regulation and licensing of dogs. (*Id.*, subds. (a), (b).) Section 30804.7, subdivision (d) also provides "[n]o city or county ... is subject to any civil action by the owner of a dog that is spayed or neutered in accordance with this section." The County defendants contend that the statutory immunity provision precludes them from civil liability for Luke's death because Luke was neutered pursuant to SNIP, which is funded by impound fines. Tarpy responds that the statutory provision does not apply to such voluntary neutering programs and that this language was included in the statute as a result of a legislative drafting error. Tarpy's contention is well taken.

■ The parties' dispute involves an issue of statutory interpretation, which is a question of law subject to de novo review on appeal. (*Bialo v. Western Mutual Ins. Co.* (2002) 95 Cal.App.4th 68, 76–77 [115 Cal.Rptr.2d 3].) In interpreting section 30804.7, our goal is to ascertain and carry out the Legislature's intent. (Code Civ. Proc., § 1859.) We look to the words of the statute itself, which is normally the best indicator of the lawmakers' intent. (*People v. Goodloe* (1995) 37 Cal.App.4th 485, 490–491 [44 Cal.Rptr.2d 15].) If the statutory words are clear and unambiguous, we may not modify them to accomplish a purpose not apparent on the face of the statute or from its legislative history. (*Ibid.*) However, whether a statute is ambiguous is not always readily ascertainable and, in determining this issue, we must consider it in the context of the relevant statutory framework. (*Ibid.*)

■ Applying these principles, we conclude that section 30804.7 is ambiguous on its face. The statute is included in Food and Agricultural Code, division 14, chapter 3, which governs dog *licensing*. Although the statutory language in question purports to create immunity from civil liability to "the owner of a dog that *is spayed or neutered in accordance with this section*," section 30804.7 does not contain any provision authorizing, requiring or even addressing the spaying or neutering of dogs. (*Id.*, subd. (d), italics added; cf. §§ 30503, 30520 [setting forth spaying and neutering requirements for public pounds and animal shelters].) Contrary to the County defendants'

arguments, the statute's directive that local agencies use the fines received from impounding dogs to fund low-cost spaying and neutering programs or other administrative expenses does not address local agencies' activities in spaying or neutering dogs. The meaning and significance of the immunity provision of section 30804.7 is thus ambiguous.

■ Where the meaning of the statutory language is not clear, we must look to the legislative history as a source of information as to the underlying legislative intent. (*In re J. W.* (2002) 29 Cal.4th 200, 210 [126 Cal.Rptr.2d 897, 57 P.3d 363].) The evolution of a proposed statute after its original introduction in the Senate or Assembly can offer considerable enlightenment as to legislative intent. (*People v. Goodloe, supra*, 37 Cal.App.4th at p. 491.)

Section 30804.7 was adopted into law through Assembly Bill No. 1856, which was intended in part to reduce the number of unwanted dogs in California. In its initial form, the bill called for a substantial change in the law that would prohibit any pound, animal shelter, breeder, pet shop or individual from selling or giving away any dog that was not spayed or neutered. (Assem. Bill No. 1856 (1997–1998 Reg. Sess.) as introduced Feb. 13, 1998, § 1.) The bill was quickly amended, however, to create certain exemptions from such a broad prohibition. (Assem. Bill No. 1856 (1997–1998 Reg. Sess.) as amended Mar. 19, 1998, §§ 2–5.)

As amended, the bill provided for the enactment of a new section 30804.5 of the Food and Agricultural Code, which would have required a city or county animal control agency to spay or neuter any unlicensed nonspayed or unneutered dog it impounded, or any licensed unaltered dog it impounded more than once, before releasing the dog back to its owner. (Assem. Bill No. 1856 (1997–1998 Reg. Sess.) as amended Mar. 19, 1998, §§ 2–5.) The new section 30804.5 added the immunity language, which absolved a city or county from civil liability to the owner of a dog spayed or neutered "in accordance with this section." (Assem. Bill No. 1856, *supra*, as amended Mar. 19, 1998, § 5.)

As reflected in legislative analyses of the bill, the immunity provision was intended to render local entities that spayed or neutered dogs in accordance with the bill's mandatory spaying and neutering provisions immune from civil lawsuits resulting therefrom. (E.g., Assem. Com. on Appropriations, Analysis of Assem. Bill No. 1856 (1997–1998 Reg. Sess.) May 13, 1998, p. 2; Sen. Com. on Judiciary, Analysis of Assem. Bill No. 1856 (1997–1998 Reg. Sess.) as amended May 19, 1998, pp. 1–2.) At the time the immunity provision was added to the bill, there was no provision requiring local entities to use impound fines to fund voluntary spaying and neutering programs. (*Assem. Bill No. 1856 (1997–1998 Reg. Sess.) as amended Mar. 19, 1998,* § 5.)

Assembly Bill No. 1856 was subsequently amended to require local entities to (1) impose fines on owners of licensed unaltered dogs that were impounded once or twice and (2) spay or neuter licensed dogs that were impounded a third time or unlicensed dogs on their first impound. (Assem. Bill No. 1856 (1997–1998 Reg. Sess.) as amended Apr. 27, 1998, § 5.) At that time, the bill was also amended to require local entities to use the impound fines so collected for humane education, programs for low-cost spaying and neutering and administration costs. (*Ibid.*)

After various organizations, individuals and the Governor's Office of Planning and Research objected to the bill's mandatory spay and neutering provision (Sen. Com. on Judiciary, Analysis of Assem. Bill No. 1856 (1997–1998 Reg. Sess.) as amended May 19, 1998, pars. 4–5), the Senate amended the bill to delete that provision from proposed section 30804.5. (Assem. Bill No. 1856 (1997–1998 Reg. Sess.) as amended June 30, 1998, § 5.) Although the Senate's amendments also called for "technical and clarifying changes" in connection with the deletion, the immunity provision remained. (Concurrence in Sen. Amends., Assem. Bill No. 1856 (1997–1998 Reg. Sess.) as amended Aug. 20, 1998, p. 1.) As so amended, proposed section 30804.5 was renumbered as section 30804.7 and thereafter enacted. (Assem. Bill No. 1856 (1997–1998 Reg. Sess.) as amended Aug. 20, 1998, § 4.)

The legislative history shows that the statutory immunity was created to protect local agencies from civil liability for carrying out mandatory spayings and neuterings pursuant to a provision that was later deleted from the statute. (E.g., Sen. Com. on Judiciary, Analysis of Assem. Bill No. 1856 (1997–1998 Reg. Sess.) as amended May 19, 1998, pp. 1–2.) Based on the statutory language and the legislative history, we conclude that the Legislature did not intend to create a broad statutory immunity for civil claims arising out of the spaying or neutering of a dog pursuant to any low-cost spaying or neutering program maintained by a city or county. Although the County defendants assert that the immunity provision can be "harmonized" with section 30804.7, subdivision (b) because providing local entities immunity from lawsuits arising out of neutering procedures encourages such entities to implement low-cost spaying and neutering programs, they cannot point to any evidence that this is what the Legislature intended in adding the immunity provision.

■ We recognize that it is generally the responsibility of the Legislature to correct errors in statutory language. (*Unzueta v. Ocean View School Dist.* (1992) 6 Cal.App.4th 1689, 1698 [8 Cal.Rptr.2d 614].) However, we must nonetheless interpret the statutory language as it exists. Although the law generally requires an interpretation of a statute that does not render any of its provisions surplusage (*State of South Dakota v. Brown* (1978) 20 Cal.3d 765,

776–777 [144 Cal.Rptr. 758, 576 P.2d 473]), it is also true that the courts generally cannot make interlineations in the statutory language to accomplish a purpose that does not appear on the face of the statute or from its legislative history. (*Bialo v. Western Mutual Ins. Co., supra,* 95 Cal.App.4th at p. 78.) Here, a review of the statutory language suggests that the immunity provision is surplusage because the statute does not provide for the spaying or neutering of dogs; the legislative history of the statute confirms this conclusion. It is not appropriate for us (or the trial court) to extrapolate the statutory language to facilitate a purpose not intended by the Legislature.

The trial court erred in concluding that the County defendants are immune from Tarpy's claims based on section 30804.7, subdivision (d) and thus erred in granting summary judgment in favor of the County defendants on that basis.

## 2. *Release*

A written release generally extinguishes any obligation covered by its terms, provided it has not been obtained by fraud, deception, misrepresentation, duress or undue influence. (*Skrbina v. Fleming Companies* (1996) 45 Cal.App.4th 1353, 1366 [53 Cal.Rptr.2d 481].) When a person with the capacity of reading and understanding an instrument signs it, he is, in the absence of fraud and imposition, bound by its contents and estopped from saying that its provisions are contrary to his intentions or understanding. (*Jefferson v. Department of Youth Authority* (2002) 28 Cal.4th 299, 303 [121 Cal.Rptr.2d 391, 48 P.3d 423].) However, assent is required and, unless he is estopped to do so, a party to a contract may seek to be relieved from the effect of his signature based on a showing that he did not in reality assent to it. (*Skrbina v. Fleming Companies, supra,* at pp. 1366–1367.)

Here, all of the defendants relied on the release as a complete defense to Tarpy's claims and introduced uncontroverted evidence that Tarpy signed the release. As Tarpy does not contest that his claims are within the scope of the release language (except as to his intentional tort claims, which are addressed below), the defendants have met their burden to show that a complete defense to his claims exists. (Code Civ. Proc., § 437c, subd. (p)(2).) Tarpy nonetheless contends that summary judgment is not appropriate because he presented evidence supporting a triable issue of fact as to whether he acted under duress in signing the release.

Duress generally exists whenever one is induced by the unlawful act of another to make a contract or perform some other act under circumstances that deprive him of the exercise of free will. (*Lewis v. Fahn* (1952) 113 Cal.App.2d 95, 98, 100 [247 P.2d 831].) As defined by statute, duress may

arise from an unlawful confinement of a person or an unlawful detention of the person's property. (Civ. Code, § 1569.) Statutory duress requires confinement or detention that is unlawful, to wit, resulting from a tortious or criminal act. (*Ibid.*; *Rich & Whillock, Inc. v. Ashton Development, Inc.* (1984) 157 Cal.App.3d 1154, 1158–1159 [204 Cal.Rptr. 86]; see also *Louisville Title Ins. Co. v. Surety Title and Guar. Co.* (1976) 60 Cal.App.3d 781, 806 [132 Cal.Rptr. 63] [a threat to do what one is legally entitled to do cannot give rise to duress].)

■ In addition to statutory duress, the law recognizes the concept of economic duress as a basis for vitiating a coerced party's consent to an agreement. (*CrossTalk Productions, Inc. v. Jacobson* (1998) 65 Cal.App.4th 631, 644 [76 Cal.Rptr.2d 615].) Economic duress does not necessarily involve an unlawful act, but may arise from an act that is so coercive as to "cause a reasonably prudent person, faced with no reasonable alternative, to agree to an unfavorable contract." (*Ibid.*; cf. *Rich & Whillock, Inc. v. Ashton Development, Inc., supra,* 157 Cal.App.3d at p. 1158 [indicating that the act must be "wrongful"].)

On appeal, Tarpy concedes that he is not relying on an economic duress theory, but instead asserts that there is a triable issue of fact as to whether he agreed to neuter Luke as a result of the County defendants' mental coercion through the lack of reasonable alternatives and their unlawful detention of Luke. He argues that the County defendants failed to offer him the fee payment options available under applicable county regulations and the Department's policies and that this rendered their retention of Luke unlawful. Tarpy's argument is unavailing.

In accordance with County regulations, the Department is required to charge and collect applicable fees, when due, unless it authorizes a payment arrangement or waives the fees in full or in part in accordance with departmental policies. (San Diego County Code, § 62.603, subd. (c).) The regulations also provide that the Department may defer "[s]pecified fees" for 30 days, subject to the conditions specified in departmental policies, where the owner claims an economic hardship or inability to pay the fees when due. (*Ibid.*)

The Department's policy and procedure manual (the Manual) states that "[s]helter personnel should not express to the public the possibility of [getting billed for] fees" and that an owner "should make every attempt to pay the fees due." Pursuant to the Manual, the Department has the discretion to allow deferred billing for an owner who has two or fewer impounds; however, in practice the Department does not allow deferred billing to an owner whose pet has previously been impounded. The Manual also allows the Department to waive impound fees in excess of $5 only under specified circumstances,

including where the payment of fees would result in "[e]xtreme economic hardship." Where an owner asserts such hardship, the Manual provides that Department staff "should" complete and the owner "should" sign a waiver application, approval of which is to be made in the discretion of the Department. (See also San Diego County Code, § 62.603, subd. (c).)

Contrary to Tarpy's argument, the foregoing regulations and policies did not require the Department to offer him payment alternatives or to waive the impound fees, but rather provided the Department with discretion to allow for deferred billing, or to grant fee waivers based on a showing of economic hardship. Tarpy responds that, to the extent the Department's decision was discretionary, the Department abused its discretion because it acted arbitrarily in refusing to permit him deferred billing or a fee waiver. This contention is not borne out by the record. The evidence shows that the Department declined to offer Tarpy deferred billing because it was Luke's second impound in just over a month and it declined to waive the fees because Luke was still unneutered. Such bases for the Department's decision were not arbitrary, but in fact consistent with the County's Pet Project 2000, the goal of which was to end the euthanasia of adoptable and treatable animals in shelters primarily by encouraging owners to spay or neuter their impounded pets. Tarpy has not shown that the Department's retention of Luke was unlawful based on its refusal to allow him deferred billing or to waive his impound fees.

Tarpy also argues that the Department's retention of Luke was unlawful because the Department failed to comply with San Diego County Code section 62.678, which provides that, after impounding a licensed dog, the Department must mail or personally deliver to its owner an impound notice indicating that the owner has the right to request an administrative hearing regarding the legality of the impoundment. (*Ibid.*) There are several problems with this argument. First, because Luke was not licensed at the time Officer Wix impounded him, San Diego County Code section 62.678 is inapplicable pursuant to its express terms. Further, even if the regulation was otherwise applicable, Tarpy has not submitted any evidence to establish that the Department failed to give him the requisite notice.

Finally, Tarpy contends that the Department's retention of Luke was unlawful because Officer Wix was required pursuant to written Department policy to immediately turn Luke over to his father. However, Tarpy misreads the Department policy, which requires the immediate return of an impounded animal to an owner who (1) is at the scene of the impound, (2) presents satisfactory evidence of personal identification, valid rabies vaccination or current licensing and (3) pays the appropriate impound fee. Although Tarpy's father offered to pay the impound fee, he was not Luke's rightful owner and

did not offer to provide Officer Wix (nor has it been shown that he could have presented) evidence that Luke was properly vaccinated or licensed.

For these reasons, we conclude that Tarpy has not raised a triable issue of fact as to whether the Department's retention of Luke was unlawful so as to establish statutory duress. Thus the release is valid and enforceable.

Tarpy argues that in any event the release does not apply to his claims arising from the Department's wrongful impoundment and detention of Luke, but is limited to those claims arising from the surgery and Luke's death. However, although various of Tarpy's claims include such allegations, a review of the complaint establishes that each of his claims seeks recovery of general and special damages arising from Luke's death. Tarpy waived all such claims by his agreement to "release the Department of Animal Control and the County of San Diego and its officers, agents, and employees, from and against any and all claims ... arising from the surgery [on Luke]."

Tarpy's final argument is that the release is void as contrary to public policy. However, "no public policy opposes private, voluntary transactions in which one party, for a consideration, agrees to shoulder a risk which the law would otherwise have placed upon the other party ...." (*Tunkl v. Regents of University of California* (1963) 60 Cal.2d 92, 101 [32 Cal.Rptr. 33, 383 P.2d 441].) Here, Tarpy agreed to have Luke neutered and entered into the release to benefit from reduced impound fees. Such an agreement, voluntarily entered into, does not violate public policy.

The trial court properly granted summary judgment on the complaint in favor of the defendants.

## DISPOSITION

The judgment is affirmed. The defendants are awarded their costs on appeal.

Huffman, Acting P. J., and O'Rourke, J., concurred.

Appellant's petition for review by the Supreme Court was denied September 10, 2003.