[Nos. B216291, B218554. Second Dist., Div. One. June 28, 2010.]

MARK STEINMAN, as Trustee, etc., Plaintiff and Appellant, v.
KENNETH D. MALAMED et al., Defendants and Respondents.

COUNSEL

Browne Woods George, Eric M. George and Ira Bibbero for Plaintiffs and Appellants.

Baer & Troff and Eric L. Troff for Defendants and Respondents.

OPINION

**JOHNSON, J.**—Mark Steinman and the Steinman Family Trust (collectively, Steinman) settled their action against Kenneth D. Malamed and Financial Management Advisors, Inc., and Financial Management Advisors, LLC (collectively, FMA). The trial court dismissed the action pursuant to a stipulation by the parties, and retained jurisdiction to enforce the settlement agreement. After FMA paid Steinman the amount due under the settlement early in order to take advantage of a prepayment discount, FMA filed a motion to enforce the prepayment provision: FMA argued that it had overpaid, and sought to recover the overpayment amount. The trial court granted the motion and filed an order requiring Steinman to return the overpayment; later, the court awarded FMA attorney's fees and prejudgment interest. Steinman appeals the order requiring him to ·return the overpayment and the order awarding

attorney's fees and prejudgment interest. We reverse the judgment and vacate the order awarding attorney's fees.

## FACTS AND PROCEDURAL HISTORY

In 2004, Steinman sued FMA for breach of fiduciary duty and fraud, in connection with FMA's advice and investment services regarding a securities investment made by Steinman on behalf of the trust. The trial court conducted a bench trial and on May 22, 2007, issued a 106-page proposed statement of decision, finding FMA liable for breach of fiduciary duty and awarding Steinman the return of the $4 million investment, with 9 percent interest from the date of the investment, September 3, 1999.

Steinman and FMA then reached a settlement agreement on July 6, 2007, under which FMA agreed to pay Steinman $6.5 million. By July 16, 2007, FMA had paid Steinman $2 million in cash, leaving a balance of $4.5 million to be paid over six years pursuant to a payment schedule, and secured by a promissory note. On July 18, 2007, the trial court entered a stipulated dismissal referencing the settlement agreement, and retained jurisdiction over the parties to enforce the terms of the agreement.

The settlement agreement and the promissory note each contained a provision providing FMA with a discount to encourage early payment of the amounts due. The second and final early payment date was June 1, 2008.[1] Around that time, FMA was attempting to sell off its assets to another company, First Western, and, as a condition for closing the transaction, Malamed had to personally indemnify First Western in the amount required to pay Steinman off. Malamed could only afford to do so at the discounted prepayment amount. Steinman and FMA, however, did not agree on the calculation of what would be due to pay off the note by June 1, 2008. On May 29, 2008, FMA wrote Steinman: "despite our belief that your calculation may be in error, we will be using it on a preliminary basis to close the deal and will send those funds to you under protest." On May 30, 2008, FMA wired $3,929,822.65 to Steinman.

FMA filed a "Complaint to Recover Overpayment of Promissory Note and For Fraud" against Steinman on July 23, 2008. FMA alleged that it had made the payment under protest, resulting in an overpayment of at least

---

[1] The settlement agreement provided: "On or before June 1, 2008, Defendants may fully satisfy the Promissory Note by a payment of (i) all of the then accrued but unpaid interest and (ii) all of the unpaid principal up to the total principal amount of Three Million Seven Hundred Fifty Thousand Dollars ($3,750,000)." The promissory note contained a substantially identical provision.

$297,716.72. The complaint requested the overpayment amount, interest, and punitive damages. FMA voluntarily dismissed the complaint in October 2008.

On November 10, 2008, FMA filed a motion to enforce the prepayment provision of the parties' settlement agreement and promissory note in the underlying case, in which the trial court had entered a stipulated dismissal and had retained jurisdiction to enforce the settlement agreement. The motion set the overpayment amount at $325,219.40, and requested prejudgment interest and attorney's fees. On November 21, 2008, Steinman filed a request that the trial court enter a stipulated judgment against FMA, arguing that FMA had breached the settlement agreement by filing its separate lawsuit and by asking the trial court to determine the overpayment amount.

On March 23, 2009, the trial court filed an order after hearing, concluding that FMA's May 30, 2008 payment was made involuntarily, and that FMA was thus entitled to the return of an overpayment of $332,534.56 (according to the trial court's calculation). On April 22, 2009, the court filed an order denying Steinman's motion for entry of stipulated judgment and granting FMA's motion to enforce the prepayment provision. Steinman filed a notice of appeal on May 19, 2009 (No. B216291).

On June 2, 2009, FMA filed a motion for attorney's fees and prejudgment interest, under the settlement agreement and the promissory note. After a hearing, the trial court found that FMA was the prevailing party, and in a July 27, 2009 minute order awarded FMA $47,250 in attorney's fees and $29,701.86 in prejudgment interest. Steinman filed a notice of appeal on August 21, 2009 (No. B218554).

We consider the two appeals together.

## DISCUSSION

I. *The orders are appealable.*

Code of Civil Procedure section 904.1[2] provides: "(a) An appeal, other than in a limited civil case, is to the court of appeal. An appeal, other than in a limited civil case, may be taken from any of the following: [¶] (1) From a judgment . . . . [¶] (2) From an order made after a judgment made appealable by paragraph (1)." FMA argues that because the trial court's stipulated dismissal pursuant to the parties' settlement is not itself an appealable judgment, the order granting FMA's motion to enforce the prepayment

---

[2] All further statutory references are to the Code of Civil Procedure unless otherwise indicated.

provision and the subsequent award of attorney's fees and prejudgment interest are not appealable. We disagree.

The trial court did not enter judgment at the time that it entered the stipulated dismissal pursuant to the settlement. Instead, the court retained jurisdiction over the matter to enforce the terms of the settlement agreement, which it did conclusively when it granted FMA's enforcement motion, the subject of this appeal. The court's order concluded that FMA had overpaid the total amount due under the settlement agreement, and was entitled to a return of the overpayment amount. The court determined that the sum due under the settlement agreement and promissory note was $3,597,288.19, and ordered Steinman to return to FMA the amount it had overpaid, $332,534.56. In determining the amount due under the early payment provision, the court effectively exercised its retained jurisdiction to fix the total due under the settlement agreement.

■ Steinman's appeal argues that the trial court erred in enforcing the prepayment provision in FMA's favor. While a settlement stipulation results in the waiver of any right to appeal from the judgment entered under the stipulation, it does "not preclude an appeal to determine whether or not the judgment was authorized by the stipulation." (*Rooney v. Vermont Investment Corp.* (1973) 10 Cal.3d 351, 359 [110 Cal.Rptr. 353, 515 P.2d 297].) The trial court's order interpreted the settlement agreement to authorize the repayment to FMA, and is appealable. We deem this order as the judgment.

■ FMA cites *Epstein v. DeDomenico* (1990) 224 Cal.App.3d 1243 [274 Cal.Rptr. 521], for the proposition that Steinman cannot appeal because he has voluntarily accepted the benefit of the settlement. There is an exception, however, to the general rule that " 'the voluntary acceptance of the benefit of a judgment or order is a bar to the prosecution of an appeal there-from . . .' . . . where the appellant's right to the accepted portion of the judgment is not disputed on appeal." (*Id.* at p. 1246, citations omitted.) Here, Steinman has accepted $3,597,288.19, the amount to which both parties agree he is entitled; it is the $332,534.56 he was ordered to repay that is in dispute. "[T]he appeal as to the disputed portion may proceed, because a reversal will have no effect on the appellant's right to the benefit he . . . has accepted." (*Ibid.*) Steinman will be entitled to the $3,597,288.19 regardless of the outcome of this appeal, and so the trial court's order requiring him to repay the lesser amount is appealable.

II. *The trial court's factual finding that FMA's payment was made under protest and was involuntary is not supported by substantial evidence.*

In its order filed March 23, 2009, the trial court accepted FMA's interpretation of the terms of the settlement agreement, determined that FMA's

payment of $3,929,822.65 on May 30, 2008, " 'made under protest' " "was not made voluntarily," and ordered Steinman to return to FMA an overpayment amount of $332,534.56. On this appeal, Steinman challenges only the trial court's finding that the May 30, 2008 payment was made under protest and was not voluntarily made. We agree with the parties that this is a factual finding, and "[t]he trial court's factual findings on a motion to enforce settlement pursuant to section 664.6 are subject to limited appellate review and will not be disturbed if supported by substantial evidence." (*Williams v. Saunders* (1997) 55 Cal.App.4th 1158, 1162 [64 Cal.Rptr.2d 571].) "Where findings of fact are challenged on a civil appeal, . . . '. . . the power of an appellate court begins and ends with a determination as to whether there is any substantial evidence, contradicted or uncontradicted,' to support the findings below. [Citation.] We must therefore view the evidence in the light most favorable to the prevailing party, giving it the benefit of every reasonable inference and resolving all conflicts in its favor . . . ." (*Jessup Farms v. Baldwin* (1983) 33 Cal.3d 639, 660 [190 Cal.Rptr. 355, 660 P.2d 813].)

### III. *Involuntary payment*

At trial and on appeal, both parties cite *Western etc. Oil Co. v. Title Ins. & Tr. Co.* (1949) 92 Cal.App.2d 257 [206 P.2d 643] (*Western Gulf*). In *Western Gulf*, the plaintiff and the defendant disputed whether the plaintiff could deduct charges for cleaning and dehydration from its royalty payments on an oil lease. Over a four-month period, the plaintiff withheld oil cleaning charges from the royalty payments. The defendant gave notice that the lease had been violated and demanded that the plaintiff pay the withheld amount within 60 days. The plaintiff did so, stating in a letter that it was paying only to preserve the lease, and was not admitting that it was required to pay the charges. The defendant then wrote that it would not accept the payment if acceptance meant assenting to the terms of the letter. After the plaintiff replied that its payment "was not subject to assent or acquiescence in the deductions or statements in plaintiff's letter," the defendant accepted the check. (*Id.* at p. 261.) For three more months, the plaintiff made the royalty payments and assessed a "cleaning charge," including a letter with the last payment advising the defendant that it was planning to file suit and was making the payment " 'without prejudice' " to its right to deduct cleaning costs from royalties. When the defendant again refused to accept the tender, the plaintiff once again advised the defendant that the tender was not subject to the conditions in the letter, and the defendant again accepted the payment. (*Id.* at pp. 261–262.) The plaintiff sued to recover the payment.

■ The trial court concluded that the payment was "voluntarily paid by plaintiff to defendant and could not be recovered." (*Western Gulf, supra*, 92 Cal.App.2d at p. 262.) The Court of Appeal agreed, because the letters showed that the plaintiff was attempting to make the payments subject to conditions that were not acceptable to the defendant, and "[t]he payments were finally made and accepted without any conditions or reservations . . . ." (*Id.* at p. 265.) "Payments voluntarily made, with knowledge of the facts, cannot be recovered." (*Id.* at p. 266.)

This case presents a different factual situation but, as in *Western Gulf*, the evidence shows that the payment by FMA was voluntary. In *Western Gulf*, the court concluded that the payments made after a long series of disputes over whether cleaning charges could be deducted were voluntary, because the final payments were made and accepted "without any conditions or reservations." Here, however, there was no protracted dispute about the amount due and no payment amounts were ever withheld. The record demonstrates that on April 29, 2008, just over a month before the deadline for the prepayment discount, Malamed sent an e-mail to Steinman, asking how much was required to pay off the note. On May 5, 2008, Steinman responded that the amount was $3,954,039.77. On May 6, Malamed replied, "We need to talk—we show a much smaller amount." On May 7, 2008, Steinman sent Malamed an e-mail subtracting FMA's May 2008 payment, resulting in a final early payment amount due of $3,929,822.65. At FMA's request, Steinman sent a formal demand for payment reflecting that amount on May 14, 2008. An edited version followed on May 22, 2008.

Apart from an apparently inadvertent e-mail making reference to the letter's request for a release, FMA did not communicate with Steinman regarding the payment amount in the May 7 e-mail until the eve of the June 1 payment deadline. On May 29, 2008, FMA sent a letter to Steinman which reminded Steinman's counsel that FMA had been working to close the sale of its assets to another company, and thanked Steinman for sending the demand for payoff of the promissory note. The letter continued: "Given the shortness of time, and the desire of all parties to get this transaction closed, despite our belief that your calculation may be in error, we will be using it on a preliminary basis to close the deal and will send those funds to you under protest. . . . Please understand, however, we are doing this in the interests of not slowing down the closing of the transaction in chief. Post-closing we look forward to continuing our discussions with you to reach mutual agreement as to what the proper payoff calculation is." In a responsive letter dated the same day, Steinman's counsel objected, "it is inconceivable that we would be presented at the virtual eleventh hour with an invitation to accept funds under protest, with the implicit suggestion of future litigation."

FMA's May 29 letter stated that it would make the payment under protest and intended to challenge the asserted overpayment. This did not, however, automatically make FMA's payment the next day "under protest" and involuntary. Steinman's same-day response to the letter made it clear that he would not accept a last-minute payment "under protest," and FMA wired the funds May 30 without further communication or reservation of rights. Even more importantly, FMA had not consistently disputed the amount due, and remained silent after the May 7 e-mail until May 29. Steinman was thus blindsided by FMA's May 29 statement that it would make the payment "under protest." The record in this case shows the parties working together to compute an accurate early payment amount, and a failure by FMA to challenge the final amount until the last minute, followed by Steinman's refusal to accept the funds "under protest." FMA made the payment by wire the next day without communicating any reservation. Under these circumstances, the payment was not made "under protest."[3]

 Even if the payment had been truly "under protest," that would not necessarily make the payment involuntary, as more is required. The *Western Gulf* court explained: "Payments of illegal claims enforced by duress, coercion or compulsion, when the payor has no other adequate remedy to avoid it, will be deemed to have been made involuntarily and may be recovered, but the payment must have been enforced by coercion and there must have been no other adequate means available to prevent the loss." (*Western Gulf, supra,* 92 Cal.App.2d at p. 265.) Duress for this purpose is shown " 'where, by reason of the peculiar facts a reasonably prudent man finds that in order to preserve his property or protect his business interests it is necessary to make a payment of money which he does not owe and which in equity and good conscience the receiver should not retain, [and thus] he may recover it. [Citation.]' [¶] Whether the plaintiff, through its agents or representatives, acted as a reasonably prudent person, depends upon the facts and circumstances and is a question for the trial court's determination. [Citation.]" (*Id.* at p. 266.)

---

[3] FMA points out that it filed suit to recover the "overpayment" on July 23, 2008, just under two months after the wire transfer on May 30, 2008. But the filing of that suit does not retroactively convert the voluntary payment into one made involuntarily. In *Western Gulf* the court noted that the plaintiff "could have commenced action immediately under the provisions of [section] 1060 of the Code of Civil Procedure, asking for temporary relief from forfeiture of the lease until the matter was finally determined. Instead, plaintiff chose to pay the disputed amount, thus removing the grounds for possible forfeiture of the lease, and delayed commencement of the action some 208 days. Moreover there was evidence from which the trial court could infer that the payments were made to avoid litigation until such time as plaintiff elected to commence action." (*Western Gulf, supra,* 92 Cal.App.2d at pp. 265–266.) We draw no similar conclusion in this case about FMA's motives.

In support of his argument that FMA made the payment involuntarily, Malamed stated in a declaration that by June 1, 2008, FMA had sold off some of its assets and was in a position to pay Steinman off early, in the amount of $3,604,603.18, based on FMA's interpretation of the early payment provision. In another declaration, Malamed stated that in the months preceding the June 1, 2008 deadline for early payment, he needed to close the First Western deal in order to pay Steinman and to avoid financial ruin to himself and to FMA. To make the "overpayment," Malamed borrowed over $300,000 from First Western, which he was personally obligated to repay. FMA argues that this was substantial evidence from which the trial court could conclude that not only did FMA and Malamed not agree to pay without reservation, but the payment was involuntary because it was reasonably prudent to conclude that in order to protect business interests (that is, in order to sell FMA's assets to preserve the business, and to avoid personal bankruptcy), " 'it [was] necessary to make a payment of money which [FMA] does not owe . . . .' " (*Western Gulf, supra*, 92 Cal.App.2d at p. 266.) "[A] reasonably prudent person subject to [economic duress] may have no reasonable alternative but to succumb when the only other alternative is bankruptcy or financial ruin." (*Rich & Whillock, Inc. v. Ashton Development, Inc.* (1984) 157 Cal.App.3d 1154, 1159 [204 Cal.Rptr. 86].)

■ There is, however, no evidence in the record to support another requirement for a finding of economic duress: the party insisting on payment must act wrongfully, with the knowledge that the claim asserted is false. (*Leeper v. Beltrami* (1959) 53 Cal.2d 195, 204 [1 Cal.Rptr. 12, 347 P.2d 12]; see *Rich & Whillock, supra*, 157 Cal.App.3d at p. 1158 ["coercive" act creating the duress need not necessarily be unlawful, but must be wrongful]; *Tarpy v. County of San Diego* (2003) 110 Cal.App.4th 267, 277 [1 Cal.Rptr.3d 607].) "Examples of such 'wrongful acts' include the assertion of a claim known to be false, a bad faith threat to breach a contract or a threat to withhold a payment." (*CrossTalk Productions, Inc. v. Jacobson* (1998) 65 Cal.App.4th 631, 645 [76 Cal.Rptr.2d 615].)

While FMA and Steinman originally differed in their calculation of the amount due, Steinman's request for payment was not "wrongful" or knowingly false. The record shows, instead, a "legitimate dispute" over an "uncertain amount owed." (*San Diego Hospice v. County of San Diego* (1995) 31 Cal.App.4th 1048, 1058–1059 [37 Cal.Rptr.2d 501] [no economic duress where there is a legitimate dispute over liability rather than a refusal to pay an acknowledged debt].) Nor is there evidence of a bad faith attempt to breach the settlement agreement. Malamed's declaration states that Steinman had "threatened to 'wipe out' the prepayment provision" if FMA did not pay the greater amount. The exhibit cited by the declaration, however, is Steinman's May 29, 2008 letter, which stated that if FMA did not make the payment by June 1, 2008, in time to take advantage of the prepayment discount, Steinman would

demand payment of the nondiscounted sum (as of June 2, 2008). This was not a bad faith threat to breach a contract, but simply a reference to the terms of the settlement agreement, under which FMA was not entitled to any prepayment discount after June 1, 2008, when FMA would be liable for the full amount.[4] As the record does not contain evidence showing that Steinman's request for payment was knowingly wrongful, there was not substantial evidence of economic duress.

Further, FMA's protracted silence after Steinman's May 7 letter is an additional factor supporting a conclusion that FMA did not make the payment under duress. FMA stated on May 6 that its figures showed that a smaller payment was due, and Steinman's May 7 letter responded with a reduced payment amount, which remained unchallenged until May 29. This delay is further evidence that Steinman's demand was not coercive, as FMA's silence could be construed either as assent to the reduced payment amount in the May 7 letter, or, at the very least, an absence of coercive pressure. Presumably, given the large amount at issue, a reasonably prudent person under duress would have used this interval to take some protective action, such as offering a counter disposition amount, seeking declaratory relief pursuant to section 1060, or interpleading the money.

■ The trial court's conclusion that FMA's payment was involuntary is not supported by substantial evidence.

## IV. *The California Uniform Commercial Code does not apply.*

The trial court also concluded that the California Uniform Commercial Code supported the characterization of the payment as "made by check

---

[4] At oral argument, counsel for FMA characterized Steinman's May 29, 2008 letter as a demand for immediate payment of the full amount of the promissory note, which echoes Malamed's statement in his declaration that Steinman had threatened to wipe out the contract's provision establishing a discount for early payment. In a subsequent letter, counsel clarified that Steinman's May 29 letter merely stated that Steinman would demand the full amount after June 2, 2008, to be paid pursuant to the monthly amortization schedule already in place. We accept this clarification of counsel's statement, which also clarifies Malamed's declaration.

We also note that a finding of economic duress does not require that the party demanding payment be the sole cause of the financial straits in which the payor finds itself. The demand for payment is enough. Even where "some of the circumstances that made the pressing of the claim particularly onerous were not created by [respondents,] . . . this does not mean that proximate cause has not been sufficiently alleged. Obviously, whenever a defendant presses a false claim against a plaintiff, and the plaintiff is forced to pay it, the primary cause of the payment is that defendant pressed the claim. The other factors relating to the existence of the [payor's difficult financial situation] merely created the situation that made the pressing of the false claim successful." (*Leeper v. Beltrami, supra*, 53 Cal.2d at p. 204.)

'under protest.' "[5] The court also stated that although the parties did not raise this point, "the Settlement Agreement may be considered to be within the terms of that Code," citing a federal district court case from New Jersey,[6] and "the use of a check to pay this debt may be sufficient to invoke application of the Code." The court also made it clear, however, that it was referring to the California Uniform Commercial Code "for assistance in resolving this matter" and was "adopting Commercial Code definitions by analogy," rather than concluding that the California Uniform Commercial Code prevailed over the common law.

■ The California Uniform Commercial Code does not apply to this case. First, we note that FMA did not make the payment by check, but by wire. Second, FMA does not argue on this appeal that the California Uniform Commercial Code applies to the settlement agreement (as the trial court suggested "may" be appropriate). Instead, FMA argues on appeal that the *promissory note* was a negotiable instrument under section 3104 of the California Uniform Commercial Code, a determination that the trial court did not make. Third and most importantly, "[t]he California Uniform Commercial Code does not automatically displace all other legal principles. Section 1103, subdivision (b), which applies to the entire California Code, provides: *'Unless displaced by the particular provisions of this code*, the principles of law and equity, including the law merchant and the law relative to capacity to contract, principal and agent, estoppel, fraud, misrepresentation, *duress, coercion*, mistake, bankruptcy, or other validating or invalidating cause supplement its provisions.' . . . [¶] Thus, other principles of law will apply here unless some particular provisions of the California Uniform Commercial Code have displaced them." (*Zengen, Inc. v. Comerica Bank* (2007) 41 Cal.4th

---

[5] Section 1308, subdivision (a) of the California Uniform Commercial Code (formerly § 1207) provides: "A party that with explicit reservation of rights performs or promises performance or assents to performance in a manner demanded or offered by the other party does not thereby prejudice the rights reserved. Such words as 'without prejudice,' 'under protest' or the like are sufficient."

[6] In *Lithuanian Commerce Corp. v. Sara Lee Hosiery* (D.N.J. 2002) 219 F.Supp.2d 600, a federal district court applied the national Uniform Commercial Code to a letter agreement "in which LCC's right to sue Sara Lee was 'exchanged' for Sara Lee's provision of pantyhose, store displays and marketing assistance" (*id.* at p. 613) and "the bulk of the letter agreement . . . details the provision of pantyhose, store displays, and marketing in order for the parties to 'continue to do business in Lithuania . . . .' It is only in the last paragraph of that two-page letter where LCC's release of legal claims against Sara Lee is discussed." (*Id.* at pp. 613–614.) The court found that the contract was properly viewed as one "payable in whole or in part in goods" under section 2-304 of the national Uniform Commercial Code (219 F.Supp.2d at p. 613), emphasizing that the bulk of the letter concerned "the transfer of goods and supporting sales materials," and concluded "focusing on the sale of goods aspect of the . . . letter does not similarly unreasonably skew the purpose of the contract." (*Id.* at p. 614.) The trial court performed no similar analysis regarding the nine-page settlement agreement between FMA and Steinman, and did not specify which section of the California Uniform Commercial Code would apply to the agreement.

239, 251 [59 Cal.Rptr.3d 240, 158 P.3d 800], second italics added; *Connecticut Printers, Inc. v. Gus Kroesen, Inc.* (1982) 134 Cal.App.3d 54, 60 [184 Cal.Rptr. 436] [Cal. U. Com. Code "require[s] that the principles of law and equity are not to be displaced by particular provisions of the Code unless done so explicitly by the Code."].) The California Uniform Commercial Code does not explicitly displace the common law regarding involuntary payment and economic duress as it applies to the settlement agreement and the payment by wire in this case. Like the trial court, we therefore do not directly apply the California Uniform Commercial Code.

Moreover, we do not find that analogy to the Code is helpful in our application of the common law. The common law principles regarding payment under protest and economic duress, which apply directly to this case, compel us to conclude that the payment was not involuntary.

## V. *Steinman is the prevailing party and is entitled to attorney's fees.*

Section 13 of the settlement agreement provides, "In the event of a dispute over the interpretation, breach and/or enforcement of this Agreement, the prevailing party in the dispute shall be entitled to recover from all other parties the costs incurred in prevailing, including reasonable attorneys fees." FMA filed a motion for attorney's fees under this provision of the agreement, and Steinman opposed the motion. After a hearing, the trial court awarded FMA $47,250 in fees and $29,701.86 in prejudgment interest.

■ Under Civil Code section 1717, where a contract provides that attorney's fees and costs shall be awarded to the prevailing party, "then the party who is determined to be the party prevailing on the contract" is entitled to reasonable attorney's fees and costs. (See *Sears v. Baccaglio* (1998) 60 Cal.App.4th 1136, 1149 [70 Cal.Rptr.2d 769] [Civ. Code, § 1717 applies when contract provides for award to prevailing party].) The identity of the prevailing party under the statute "depends upon an equitable determination of which party obtained 'a greater relief in the action.' " (60 Cal.App.4th at p. 1158.)

As explained above, we reverse the trial court's conclusion that FMA's payment was involuntary. As a result, FMA is no longer the prevailing party, and we therefore reverse the award of attorney's fees and prejudgment interest to FMA. (See *Giles v. Horn* (2002) 100 Cal.App.4th 206, 241 [123 Cal.Rptr.2d 735] [order awarding attorney's fees falls as matter of course when judgment on which it was based is reversed].)

## DISPOSITION

The judgment is reversed. The order awarding attorney's fees is vacated. Plaintiffs shall recover their costs on appeal.

Mallano, P. J., and Chaney, J., concurred.

A petition for a rehearing was denied July 15, 2010.