Filed 9/22/22  Vergara v. Loeb CA2/5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| SOFIA VERGARA,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>NICHOLAS LOEB,<br><br>    Defendant and Appellant. | B313234<br><br>(Los Angeles County<br>Super. Ct. No. BC650580) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Rafael A. Ongkeko, Judge.  Affirmed.

Merritt J. McKeon for Defendant and Appellant.

Fred Silberberg Family Law and Fred Silberberg; Jeffer Mangels Butler & Mitchell and Susan Allison for Plaintiff and Respondent.

————————————

Defendant Nicholas Loeb appeals from the judgment in favor of plaintiff Sofia Vergara, following an order granting Vergara's motion for summary adjudication under Code of Civil Procedure section 437c, subdivision (f).[1]  After a de novo review of the evidence and legal arguments relevant to the defenses Loeb asserted against Vergara's claims for declaratory relief and preliminary injunction, we affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

We begin with a review of the undisputed facts and relevant procedural history of prior and current litigation between Loeb and Vergara.

### A.      *The Parties' Relationship and the Form Directive*

In 2013, Vergara and Loeb underwent in vitro fertilization (IVF) treatments at a fertility clinic in California (the clinic), which resulted in the creation of two pre-embryos (the pre-embryos) that were then cryopreserved at the clinic.[2]

---

[1] All further statutory references are to the Code of Civil Procedure, unless otherwise stated.

[2] We adopt the terminology used in *Loeb v. Vergara* (2021) 313 So.3d 346.  " 'Generally, the procedure for IVF starts with the woman's ovaries being hormonally stimulated so that the woman can produce multiple eggs.  The eggs that the woman produces are then removed by either ultrasound-directed needle aspiration or laparoscopy, and the eggs are then put into a glass petri dish where the eggs are introduced to sperm.  After the egg is

Prior to the treatments, Loeb and Vergara executed a document entitled "Directive for Partners Regarding Storage and Disposition of Cryopreserved Material Which May Include Embryos" (the Form Directive). The Form Directive provided, in pertinent part, that the "purpose of this document is to declare our intentions and desires with respect to the storage, use and disposition of our cryopreserved material which may include embryos which are created by and stored at the [clinic]. [¶] . . . [¶] [A]ny and all changes to [this Form Directive] must be mutually agreed to between both partners. One person cannot

---

fertilized by a sperm cell, this fusion, also known as a prezygote or preembryo, keeps dividing until the prezygote gets to the four-to-eight cell stage, at which time several of the prezygotes are transferred into the woman's uterus by means of a cervical catheter. If the procedure is successful, an embryo will affix itself to the wall of the woman's uterus, differentiate, and grow into a fetus.' Marisa G. Zizzi, *The Preembryo Prenup: A Proposed Pennsylvania Statute Adopting A Contractual Approach to Resolving Disputes Concerning the Disposition of Frozen Embryos*, 21 Widener L.J. 391, 393–95 (2012)." (*Id.* at p. 353, fn. 1.)

"  ' "Pre-embryo" is a medically accurate term for a zygote or fertilized egg that has not been implanted in a uterus. It refers to the approximately 14-day period of development from fertilization to the time when the embryo implants in the uterine wall and the "primitive streak," the precursor to the nervous system, appears.' *Right of Husband, Wife, or Other Party to Custody of Frozen Embryo, Pre-embryo, or Pre-zygote in Event of Divorce, Death, or Other Circumstances*, 87 A.L.R. 5th 253 (2001) (citing *Coleman, Procreative Liberty and Contemporaneous Choice: An Inalienable Rights Approach to Frozen Embryo Disputes*, 84 Minn. L. Rev. 55 (1999))." (*Loeb v. Vergara, supra*, 313 So.3d at p. 353, fn. 2.)

use the [c]ryopreserved [m]aterial to create a child (whether or not he or she intends to rear the child) without explicit written consent of the other person (either by notary or witnessed by [a clinic p]hysician staff member or [its] staff). All changes must be in writing and signed by both parties. Unilateral changes cannot be honored by the [clinic]." (Italics added.)

Before the pre-embryos were implanted successfully into a surrogate, Loeb and Vergara ended their relationship. Vergara has never provided consent to Loeb for use of the pre-embryos.

## B.  *The Santa Monica Action*

On August 29, 2014, Loeb filed an action against Vergara and the clinic in the Superior Court of Los Angeles County, seeking to establish and enforce a right to use the pre-embryos for implantation into a surrogate (the Santa Monica action). Loeb asserted five causes of action for declaratory relief, one for breach of oral contract, and one for promissory estoppel. In support of those claims, he alleged, among other things, that: the Form Directive signed by the parties prior to the fertility treatments did not invalidate the parties' preexisting oral agreement that the pre-embryos would be immediately implanted into a surrogate; the Form Directive was not an agreement with Vergara, but instead a consent form intended to benefit and protect the clinic; and the Form Directive was unenforceable because there was no consideration, it was uncertain, and he signed it under duress. In his prayer for relief, Loeb sought declarations that: (1) he had a right to possession and custody of the pre-embryos to use them to create children; (2) Vergara was estopped from preventing him from implanting the pre-embryos

4

into a surrogate; (3) the clinic's Form Directive executed by the parties was void and unenforceable; (4) the Form Directive was unconscionable; (5) the Form Directive was subject to rescission because Loeb signed it under duress; and (6) Vergara was an egg donor under the Family Code with no parental or financial obligations to any resulting children. (*Vergara v. Loeb* (Jan. 28, 2019, B286252) [nonpub. opn.] (the anti-SLAPP opinion.)

On December 6, 2016, on the eve of a hearing on Vergara's motion for sanctions based on discovery violations and for summary judgment/adjudication, Loeb voluntarily dismissed the Santa Monica action against Vergara without prejudice. On August 11, 2017, the trial court entered judgment after dismissal in favor of Vergara that included a cost award. (*Vergara v. Loeb*, *supra*, B286252.)

## C.    *Louisiana Action I*

On November 30, 2016, Loeb as settlor created the Nick Loeb Louisiana Trust No. 1 (the trust) for the future benefit of the two principal beneficiaries of the trust, his "two daughters, Isabella Loeb and Emma Loeb, who [were] presently in a cryopreserved embryonic state" at the clinic. Loeb designated a third party as trustee and funded the trust with an initial conveyance of $28,000 which, after Loeb's death, was to be used by the trustee, in his discretion, for the "health, education, maintenance, or support" of the principal beneficiaries.

On December 7, 2016, Loeb directed the filing of a lawsuit naming the pre-embryos, the trust, and the trustee as plaintiffs against Vergara in state court in Louisiana (the Louisiana Action I). Loeb was not personally a party to the Louisiana

Action I.  The complaint filed on behalf of the pre-embryos and the trust sought relief similar to what Loeb had sought on his own behalf in the Santa Monica action, including granting Loeb control over the pre-embryos and termination of Vergara's parental rights, as well as additional relief, including a finding that Vergara had tortiously interfered with the pre-embryos' ability to inherit from the trust by preventing transfer to a surrogate.

Vergara removed the Louisiana Action I to federal court. As noted by that court, "Louisiana has the most favorable state laws regarding the rights pertaining to IVF created embryos, which make them juridical people that have the right to sue and be sued and cannot be intentionally destroyed.  [Citation.]  The plaintiffs in this suit are the pre-embryos [and the trust]." (*Vergara v. Loeb*, *supra*, B286252.)

In the fall of 2017, the federal court dismissed Louisiana Action I for lack of personal jurisdiction over Vergara.  (*Vergara v. Loeb, supra*, B286252.)

## D.    *The Current Lawsuit, Anti-SLAPP Appeal*

### 1. Vergara's Complaint

On February 14, 2017, before the Santa Monica action and the Louisiana Action I were dismissed, Vergara initiated the current lawsuit in Los Angeles Superior Court against Loeb.  Her complaint sought declaratory relief and permanent injunctive relief, and asserted causes of action for breach of contract, promissory fraud, promissory estoppel, and malicious prosecution.  Among other things, Vergara alleged that Loeb

6

breached the parties' agreement in the Form Directive not to use the pre-embryos without her written consent by filing and litigating for two years the Santa Monica action and creating the trust to pursue the Louisiana Action I, which actions caused her to suffer damages in the form of two years of litigation costs. In addition to damages, Vergara alleged that Loeb's actions in litigating the Santa Monica action and creating the trust to pursue the Louisiana Action I entitled her to declaratory and injunctive relief to prevent Loeb from engaging in any future attempt to use the pre-embryos without her written consent. Vergara further alleged that Loeb's filing and litigation of the Santa Monica action supported a claim for malicious prosecution entitling her to damages.

### 2. Anti-SLAPP Motion and Appeal

In April 2017, Loeb filed a special motion to strike under section 425.16, often referred to as the anti-SLAPP statute.[3] In November 2017, Loeb appealed the trial court's denial of his anti-SLAPP motion. In a plurality opinion filed on January 28, 2019, this Division reversed the court's denial of the anti-SLAPP motion as it related to the malicious prosecution claim only, but

---

[3] "A special motion to strike under section 425.16—the so-called anti-SLAPP statute—allows a defendant to seek early dismissal of a lawsuit that qualifies as a SLAPP. 'SLAPP is an acronym for "strategic lawsuit against public participation." ' (*Jarrow Formulas, Inc. v. LaMarche* (2003) 31 Cal.4th 728, 732, fn. 1.)" (*Nygård, Inc. v. Uusi-Kerttula* (2008) 159 Cal.App.4th 1027, 1035.)

7

upheld the court's denial of Loeb's motion as to the remaining claims. (*Vergara v. Loeb*, *supra*, B286252.)

## E.    *Louisiana Action II*

On January 9, 2018, while the anti-SLAPP appeal remained pending, Loeb filed a petition on behalf of himself and the pre-embryos in Louisiana against Vergara (the Louisiana Action II), seeking custody of the pre-embryos pursuant to the Uniform Child Custody Jurisdiction and Enforcement Act (UCCJEA), as codified in Louisiana. Loeb's petition alleged he should be granted full custody of the pre-embryos because Vergara violated her "high duty of care and prudent administration" owed to the pre-embryos by refusing to allow them to be born. In a published opinion dated January 27, 2021, the Court of Appeal of Louisiana held, among other things, that the UCCJEA did not apply to pre-embryos or unborn children, and that the trial court correctly dismissed the case for lack of subject matter jurisdiction, lack of personal jurisdiction over the parties, and for improper venue. (*Loeb v. Vergara* (2021) 313 So.3d 346, 392, 395, 401.)

## F.    *The Current Lawsuit, Motions for Summary Judgment and/or Adjudication*

In late March 2020, both Loeb and Vergara filed motions seeking summary judgment and/or adjudication in the current case.

In his motion, Loeb sought the following determinations, among others: (1) the Form Directive is void as a matter of public

policy for not complying with Health and Safety Code section 125315, because it did not address the disposition of the pre-embryos in the event of separation between Vergara and Loeb; (2) the Form Directive is an informational directive only, and not a legally enforceable contract between Vergara and Loeb; and (3) declaratory relief is not ripe for adjudication because no child was created from the pre-embryos. After a hearing on November 10, 2020, the trial court entered an order denying Loeb's motion in its entirety.

Vergara's motion sought the following determinations relevant to the current appeal: (1) the Form Directive is valid and enforceable; (2) the Form Directive is not void or voidable based on Loeb's duress defense; (3) the Form Directive prohibits Loeb from taking any action to seek unilateral control of the pre-embryos to implant them in a surrogate; (4) Loeb has not established any enforceable oral agreement with Vergara authorizing him to implant the pre-embryos in a surrogate to be born; (5) Loeb breached the Form Directive by unilaterally creating the trust naming the pre-embryos as beneficiaries; and (6) Vergara is entitled to a permanent injunction enjoining Loeb from breaching the Form Directive by making any use of the trust or engaging in any other means to seek unilateral control of the pre-embryos without Vergara's written consent.

On January 28, 2021, the trial court issued a ruling that set forth the basis for denying Loeb's motion for summary judgment and for granting summary adjudication as to Vergara's claims for declaratory and injunctive relief. As relevant here, the court granted declaratory relief: (1) that the Form Directive is a valid and enforceable contract; (2) that the Form Directive is not void or voidable based on a duress defense as to its execution; and

9

(3) there is no triable issue of material fact supporting Loeb's defense that he had an enforceable oral agreement with Vergara authorizing him to implant the pre-embryos in a surrogate to be born. On Vergara's breach of contract cause of action, the court granted relief that Loeb breached the Form Directive by his unilateral actions in filing and pursuing Louisiana Action I. On Vergara's claim for injunctive relief, the court stated it would later order a more specific injunction, and permanently enjoined Loeb from using the pre-embryos to create a child without Vergara's explicit written consent.

On March 2, 2021, the trial court entered an order granting Vergara's motion for summary adjudication. The order was consistent with the court's January 28, 2021 ruling, and further provided that "Loeb is permanently enjoined from using the [pre-e]mbryos 'to create a child (whether or not he or she intends to rear the child) without the explicit written consent of the other person (either by Notary or witnessed by [the clinic's physician or staff].'" The order further enjoined Loeb from engaging in any or all of the following conduct: "(i) Unilaterally attempting to create juridical persons from the [pre-embryos] to create standing to sue; (ii) unilaterally suing on behalf of the [pre-embryos]; (iii) unilaterally asserting any claim(s) by or on behalf of the [pre-embryos] to seek Loeb's exclusive custody and/or exclusive parental rights over the [pre-embryos]; and (iv) unilaterally asserting any claim(s) by or on behalf of the [pre-embryos] to seek relief for the purpose of unilaterally bringing the [pre-embryos] to term without Vergara's consent."

10

Final judgment was entered on March 29, 2021. Loeb timely appealed on May 26, 2021.[4]

**DISCUSSION**

On appeal, Loeb contends that the judgment in favor of Vergara is erroneous, because the trial court incorrectly granted summary adjudication on two of his defenses to Vergara's claim for declaratory relief that the Form Directive is a valid and enforceable contract.[5] Loeb argues that as a matter of law, the Form Directive is void or voidable because the clinic failed to include certain language required by Health and Safety Code section 125315. Loeb also argues that he presented a duress defense sufficient to survive summary judgment. More specifically, he claims the trial court failed to credit his evidence that Vergara subjected him to a pattern of abuse in their relationship sufficient to raise an issue that he signed the Form Directive under duress, rendering the agreement unenforceable. Loeb further contends that the anti-SLAPP opinion (*Vergara v. Loeb*, *supra*, B286252) resolved the issue of duress in his favor, such that law of the case precluded the trial court from rejecting his affirmative defense of duress.

Moving beyond the validity of the Form Directive, Loeb contends the trial court erred in finding no triable issue of fact on

---

[4] Vergara's June 30, 2021 motion to dismiss Loeb's appeal based on disentitlement is denied.

[5] Loeb's April 6, 2022 motion to file his reply brief under seal is granted.

11

the existence of an enforceable oral agreement between Loeb and Vergara. He argues his testimony presented sufficient evidence of a separate oral agreement with Vergara giving him the right to seek to implant the pre-embryos in a surrogate without Vergara's further consent. Loeb also contends that the trial court was precluded by the law of the case from ruling to the contrary.

As detailed below, we reject each of Loeb's contentions on appeal and affirm the judgment of the trial court.

## A. *Standard of Review*

A party is entitled to summary judgment "if all the papers submitted show that there is no triable issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." (§ 437c, subd. (c); see *Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 843.) A plaintiff may move for summary judgment on the ground there is no defense to the action; a defendant may move for summary judgment on the ground plaintiff's action lacks merit. (§ 437c, subd. (a)(1); *Aguilar*, at p. 843.) Once the moving party establishes a prima facie showing of the absence of a defense, or lack of merit, as the case may be, the other party may defeat summary judgment by presenting evidence "that a triable issue of one or more material facts exists as to the cause of action or a defense thereto." (§ 437c, subd. (p)(1); *Aguilar*, at p. 850.) "There is a triable issue of material fact if, and only if, the evidence would allow a reasonable trier of fact to find the underlying fact in favor of the party opposing the motion in accordance with the applicable standard of proof." (*Aguilar*, at p. 850, fn. omitted.)

We review a grant or denial of summary judgment de novo. (*Patterson v. Domino's Pizza, LLC* (2014) 60 Cal.4th 474, 499.) We consider the record before the trial court at the time of its ruling, with the exception of evidence to which the court sustained objections; we liberally construe the evidence in support of the party opposing summary judgment; and we resolve any doubts regarding the evidence in favor of that same party. (*Hughes v. Pair* (2009) 46 Cal.4th 1035, 1039.)

" 'In order to demonstrate error, an appellant must supply the reviewing court with some cogent argument supported by legal analysis and citation to the record.' " (*United Grand Corp. v. Malibu Hillbillies, LLC* (2019) 36 Cal.App.5th 142, 153.) We are not required to develop appellants' arguments for them. (*Ibid.*) "We may and do 'disregard conclusory arguments that are not supported by pertinent legal authority or fail to disclose the reasoning by which the appellant reached the conclusions he wants us to adopt.' " (*Ibid.*)

**B.** **Validity under Health and Safety Code Section 125315**

When a couple receives fertility treatment from a health care provider, Health and Safety Code section 125315 requires the provider to supply information for making "an informed and voluntary choice regarding the disposition of any human embryos remaining following the fertility treatment." (Health & Saf. Code, § 125315, subd. (a).) The statute mandates the use of a form setting forth specified alternatives for disposition of any unused pre-embryos in the event of the death of one or both parties, divorce or separation, or a decision to stop paying for

storage of the pre-embryos. (*Id.*, subd. (b).) Failure to provide the required information "constitutes unprofessional conduct" under a portion of the Business and Professions Code. (*Id.*, subd. (a).)[6]

---

[6] The relevant statutory language states:

"(a) A physician and surgeon or other health care provider delivering fertility treatment shall provide his or her patient with timely, relevant, and appropriate information to allow the individual to make an informed and voluntary choice regarding the disposition of any human embryos remaining following the fertility treatment. The failure to provide to a patient this information constitutes unprofessional conduct within the meaning of Chapter 5 (commencing with Section 2000) of Division 2 of the Business and Professions Code.

"(b) Any individual to whom information is provided pursuant to subdivision (a) shall be presented with the option of storing any unused embryos, donating them to another individual, discarding the embryos, or donating the remaining embryos for research. When providing fertility treatment, a physician and surgeon or other health care provider shall provide a form to the male and female partner, or the individual without a partner, as applicable, that sets forth advanced written directives regarding the disposition of embryos. This form shall indicate the time limit on storage of the embryos at the clinic or storage facility and shall provide, at a minimum, the following choices for disposition of the embryos based on the following circumstances: [¶] . . . [¶]

"(3) In the event of separation or divorce of the partners, the embryos shall be disposed of by one of the following actions:

"(A) Made available to the female partner.

"(B) Made available to the male partner.

"(C) Donation for research purposes.

"(D) Thawed with no further action taken.

It is undisputed that the Form Directive did not meet the statutory requirements, because it did not enumerate all available alternatives in the event the parties separated or failed to pay storage fees. Most relevant here, Loeb and Vergara were not asked to state their plan for disposition of the pre-embryos in the event they separated as a couple. The Form Directive did, however, include language governing the disposition of the pre-embryos, regardless of whether Loeb and Vergara separated or remained in a relationship. Referring to the pre-embryos as "Cryopreserved Material," the Form Directive expressly stated that "[o]ne person cannot use the Cryopreserved Material to create a child (whether or not he or she intends to rear the child) without explicit written consent of the other person (either by notary or witnessed by [clinic] Physician staff member or [clinic] staff.) All changes must be in writing and signed by both parties. Unilateral changes cannot be honored by the [clinic]." The Form Directive also provided that "failure to make a mutual decision about continued storage, use and disposition of Cryopreserved Materials <u>and</u> to notify the [clinic] of the decision . . . will result in the abandonment of the Cryopreserved Material" which would give the clinic "the right, permission and authority to dispose of or use the Cryopreserved Material."

In rejecting Loeb's argument that the Form Directive's statutory noncompliance rendered the document void as against public policy, the trial court reasoned that the language of Health and Safety Code section 125315 does not state that any deficiencies in the form would make it void or voidable. "When a

"(E) Donation to another couple or individual.
"(F) Other disposition that is clearly stated." (Health & Saf. Code, § 125315.)

15

statute creates a right and provides an explicit remedy, that statutory remedy is the exclusive remedy available for statutory violations."  We agree with this reasoning.

Loeb argues the statutory remedy is inadequate, and because a failure to comply with the Health and Safety Code is negligence per se, the trial court should have permitted him to pursue remedies available under the common law, including declaring the Form Directive (in particular the mutual consent requirement) unlawful and unenforceable under Civil Code sections 1599 and 1667.  Loeb's arguments are unpersuasive, as his proposed alternative remedy would not only override the contracting parties' reasonable expectations, they also run afoul of existing law and defy basic logic.

Loeb's proposed remedy—permitting him to void the Form Directive—would also place the parties here at risk of violating Penal Code section 367g, subdivision (b), which makes it unlawful for anyone to knowingly implant an embryo without the signed written consent of both the provider and recipient. Because Vergara provided the ova from which the pre-embryos were created, implantation without her consent would be unlawful.  The remedy Loeb seeks to impose—declaring Form Directive's mutual consent requirement void for noncompliance with Health and Safety Code section 125315, subdivision (b)— would do nothing to clarify the parties' rights and obligations to each other with respect to those pre-embryos.  Indeed, Loeb has no explanation for why the clinic's failure to comply with the Health and Safety Code—which was a failure to advise Vergara equally as much as a failure to advise Loeb—should void the written agreement to proceed by mutual consent.

16

Finally, it would be illogical for the Legislature to require providers to inform patients about their options and simultaneously permit the parties' express choice to be rendered void or voidable simply because additional options were not included. Such an approach would leave the parties, and the pre-embryos, in a state of legal limbo, with no governing document to guide decisionmaking.

Accordingly, we conclude that when IVF participants have not been advised of all the options for embryo disposition as required by Health and Safety Code section 125315, but they nevertheless agree to make future decisions by mutual consent, statutory non-compliance by the IVF provider does not make the agreement void or voidable at the election of one of the parties.[7]

## C. *Duress*

The parties dispute whether Loeb's evidence raises a material factual issue on Loeb's duress defense, and whether statements in our prior decision preclude summary adjudication of the duress issue, under the doctrine of law of the case.

### 1. Relevant Law

A contract obtained by duress is voidable, not void. (See *Barnette v. Wells Fargo Nevada Nat. Bank of San Francisco*

---

[7] Vergara's March 17, 2022 motion requesting judicial notice of filings from a separate lawsuit between Loeb and the clinic is denied, as the materials from this separate lawsuit are not relevant to our analysis.

(1926) 270 U.S. 438, 444 ["Acts induced by duress . . . are not void in law, but are voidable only, at the election of him whose act was induced by it"].) "A voidable transaction . . . 'is one where one or more parties have the power, by a manifestation of election to do so, to avoid the legal relations created by the contract, or by ratification of the contract to extinguish the power of avoidance.' " (*Yvanova v. New Century Mortgage Corp.* (2016) 62 Cal.4th 919, 930.)

a. Duress in Family Law Cases

There is a significant amount of case law examining duress in the family law context, when one spouse seeks to set aside a judgment or agreement obtained under duress. (See e.g., *In re Marriage of Rosevear* (1998) 65 Cal.App.4th 673, 684–686 (*Rosevear*) [under Family Code, section 2122, spouse seeking to set aside judgment must show duress or one of four other statutory grounds for relief, as well as inequity of the prior judgment at the time it was obtained]; *In re Marriage of Baltins* (1989) 212 Cal.App.3d 66, 84–87 (*Baltins*) [husband intentionally used coercion to induce wife's consent to an unconscionable marital settlement agreement and default judgment dissolving the marriage]; *In re Marriage of Gonzalez* (1976) 57 Cal.App.3d 736, 743–748 (*Gonzalez*) [recission of marital settlement agreement based on duress].) As explained in these cases, " ' "a contract . . . obtained by so oppressing a person by threats regarding the safety or liberty of himself, or of his property . . . as to deprive him of the free exercise of his will and prevent the meeting of minds necessary to a valid contract, may be avoided on the ground of duress." ' " (*Gonzalez*, at pp. 743–744; *Baltins*,

18

at p. 84; *In re Marriage of Broderick* (1989) 209 Cal.App.3d 489, 499 (*Broderick*) [finding no duress].)  The party seeking relief must prove the offending party's specific intent to exercise duress, accompanied by a corresponding level of proximateness between the threat and the action it is purported to have caused. (*Gonzalez*, at pp. 743–744.)  The test does not turn on the nature of the threats, but on the state of mind induced in the victim.  (*Id.* at p. 744.)  Whether duress has occurred is viewed in light of the specific circumstances of a situation, taking into consideration the attributes or characteristics of the party claiming duress, including his or her ability to resist.  (*Ibid.*)  "The coercion must induce the assent of the coerced party, who has no reasonable alternative to succumbing."  (*Baltins*, at p. 84.)

The bar to establish duress is high.  First, the party seeking relief must demonstrate that the other party's threats were made intentionally to induce him to commit or to refrain from committing certain acts to his own detriment.  (*In re Marriage of Stevenot* (1984) 154 Cal.App.3d 1051, 1073, fn. 6.)  It is not enough that threats were merely a factor in the moving party's decision.  They must be the dominating factor and actually deprive the moving party of free will.  (*Gonzalez, supra,* 57 Cal.App.3d at pp. 743–744; *Baltins, supra,* 212 Cal.App.3d at p. 84; *Broderick, supra,* 209 Cal.App.3d at p. 499.)  If there were other reasonable alternatives to succumbing to the threats, but the moving party chose instead to comply rather than to follow one or more of those alternatives, the party did not act under duress.  (*Rosevear, supra,* 65 Cal.App.4th at p. 686.)

Second, as a related principle, no duress will be found if the moving party had mixed motives for agreeing to a contract.  (*Broderick, supra,* 209 Cal.App.3d at p. 499.)  As an example, no

19

duress was found in *Broderick*, where a wife who had been the victim of past threats and domestic violence conceded that she assigned a quitclaim deed to her husband because she wanted to leave him and needed money to do so.  (*Ibid*.)

Third, passage of time between the alleged coercion and execution of the disputed agreement can defeat a claim of duress by rebutting the inference that a party was deprived of the exercise of free agency, or lacked any reasonable alternative but to agree to what he later claimed was a coerced agreement.  (See *Rosevear*, *supra*, 65 Cal.App.4th at p. 686 [fact that alleged violence took place months before settlement agreement was signed rebutted inference of duress]; *Broderick*, *supra*, 209 Cal.App.3d at p. 499.)  In short, if a contracting party has adequate time to reflect on the terms of an agreement and to obtain legal advice, but nevertheless signs an agreement he later regrets, he is not a victim of duress.  Rather, he is merely suffering " 'buyer's remorse.' "  (*Rosevear*, *supra*, 65 Cal.App.4th at p. 686.)

b.  <u>Duress in Other Cases</u>

Outside of the family law context, "[d]uress generally exists whenever one is induced by the unlawful act of another to make a contract or perform some other act under circumstances that deprive him of the exercise of free will."  (*Tarpy v. County of San Diego* (2003) 110 Cal.App.4th 267, 276 (*Tarpy*).)[8]  Statutory

---

[8] In *Tarpy*, *supra*, 110 Cal.App.4th 267, a dog owner filed suit against the county after his dog died following a neuter surgery he authorized to avoid paying additional shelter release

duress requires a person or his property to be unlawfully or fraudulently confined or detained.  (Civ. Code, § 1569.)  "Economic duress requires an unlawful or 'wrongful act which is sufficiently coercive to cause a reasonably prudent person faced with no reasonable alternative to succumb to the perpetrator's pressure.' " (*Hester v. Public Storage* (2020) 49 Cal.App.5th 668, 679 (*Hester*).)[9]

---

fees.  (*Id.* at pp. 270–272.)  Summary judgment in favor of the county was granted and affirmed on appeal, based on a signed liability waiver, despite the dog owner's claim he signed under duress.  The court rejected the dog owner's argument that his assent to the waiver of liability was negated by duress stemming from the county's mental coercion through the lack of reasonable alternatives and the county's allegedly unlawful detention of the dog.  (*Id.* at pp. 276–278.)

[9] In *Hester*, *supra*, 49 Cal.App.5th 668, the appellate court explained that "[e]conomic duress requires an unlawful or 'wrongful act which is sufficiently coercive to cause a reasonably prudent person faced with no reasonable alternative to succumb to the perpetrator's pressure.' " (*Id.* at p. 679.)  Defendant storage company's form agreement gave the company authority to declare a lien sale of storage unit contents null and void.  (*Id.* at p. 679.)  Plaintiff argued that he signed under economic duress, because refusing to sign the agreement would effectively bar him from participating in the lien sales, causing him to lose 25 percent of his income.  The court found no triable factual issue of economic duress, not only because there was no evidence of coercive conduct or bad faith, but also because "plaintiff has not established that he lacks a reasonable alternative to accepting the null and void clauses." (*Id.* at p. 680.)

2.  Evidence Before the Trial Court

In its ruling on Vergara's motion for summary adjudication, the court gave a list of six bullet points describing "the entirety of Loeb's evidence" on the issue of duress.  Five of those bullet points review testimony that was filed and considered by the court, including testimony by Loeb that he signed the Form Directive because he did not want to get yelled and screamed at by Vergara, who was being "loud," "intense," "bossy," "pushy," and "irritable," making him feel embarrassed and humiliated, that her demeaning treatment of him was a constant theme, she would call him "loser," and use obscenities against him.  One bullet point did not include a citation to any evidence, instead stating:  "Loeb also argues that he testified about a pattern of emotional and physical abuse in the relationship for which he has evidence and for which there are witnesses, all of which is the backdrop for why the events that took place on the day of signing amounted to duress."

It remains an open question whether specific pages of Loeb's deposition testimony concerning physical abuse were filed with—and considered by—the trial court when it granted Vergara's motion for summary adjudication.  In this opinion, we will refer to those pages at issue as the "missing pages," because they were initially missing from an exhibit to a declaration by Loeb's former counsel, Jalesia McQueen.  As the trial court explained in its November 10, 2020 ruling, "Unfortunately, the unredacted courtesy copy of Exhibit D that the court received (in binders prepared by Vergara's counsel) does not contain [the missing pages.]  The court, therefore, cannot analyze the substance of that testimony."  The trial court postponed deciding

22

Vergara's motion for summary adjudication and ordered Loeb "to file a copy of the opposition declaration of Jalesia McQueen, which contains a complete version of Exhibit D, attaching the deposition testimony that Loeb contends supports his contention that a pattern of abuse occurred that caused the duress in signing the [F]orm [D]irective."

According to its January 28, 2021 ruling, the trial court received a courtesy copy of the McQueen declaration sometime before December 7, 2020, but Loeb never filed the document with the court. On December 22, 2020, Loeb filed a "Notice of Lodging-Documents under Seal," but did not file or serve the document itself. The trial court noted "[t]here is a procedure for the electronic filing of a confidential record, but Loeb has not followed it." Nevertheless, the court sua sponte ordered the confidential document filed as of December 22, 2020 "to assure an accurate record."

The parties take starkly opposing views on whether the "missing pages" were part of the courtesy copy lodged with and considered by the trial court at the time of its January 28, 2021 order. In an April 6, 2022 filing titled *Appellant Nicholas Loeb's motion for the court to further augment the record, and to order those sealed documents filed under seal*, Loeb asks that this court order the trial court to "order the lodged and then filed documents previously lodged on 12/22/2020, sent under seal to the Court." On April 11, 2022, Vergara filed an opposition to Loeb's motion to further augment the record, together with her own motion to correct the record. Vergara's opposition and motion to correct pointed out that on November 8, 2021, this court granted an earlier augmentation request, so the missing pages were already part of the appellate record. Vergara's

23

motion to correct the record seeks an order under California Rules of Court, rule 8.155(c)(1), to reflect that the missing pages were *not* part of the document lodged with the trial court.[10]

Ultimately, whether the missing pages were before the trial court or not, Loeb has not raised a material factual issue on his duress defense to the Form Directive's validity and enforceability. Because resolution of the parties' dispute over whether the missing pages were part of the record before the trial court would not affect our decision, we discuss the evidence with the caveat that the record question remains unresolved.

### 3. Analysis

Even when viewed in the light most favorable to Loeb, and even assuming the missing deposition pages were part of the trial court record, the evidence Loeb relies on to raise duress as a defense to the Form Directive's enforceability does not raise a material factual issue, because Loeb unquestionably had mixed motives for signing the Form Directive, and he also had reasonable alternatives. (*Tarpy*, *supra*, 110 Cal.App.4th at pp. 277–278; *Broderick, supra*, 209 Cal.App.3d at p. 499.)

Loeb's duress argument must show that Vergara's abuse so deprived him of the exercise of his own free will and he had no

---

[10] Given that Loeb's claim of duress fails regardless of whether the missing pages were part of the trial court's record and considered by the trial court, both Loeb's April 6, 2022 motion to further augment the record and Vergara's April 11, 2022 motion to correct the record are denied. Vergara's April 11, 2022 motion to file and seal her motion to correct the record and opposition to Loeb's motion to further augment is granted.

reasonable alternative than to succumb and sign the Form Directive. (*Baltins*, *supra*, 212 Cal.App.3d at p. 84; *Gonzalez*, *supra*, 57 Cal.App.3d at pp. 743–744.)  The problem with this argument is that it ignores the fact that Loeb's own testimony indicates he was motivated by his desire to have the couple undergo the IVF treatment, and the clinic would not have created or cryopreserved the pre-embryos at issue without both parties' signatures on the Form Directive.  Loeb focuses his claim of duress not on his decision to sign the documents necessary to obtain IVF treatment with Vergara and the clinic, but only on one aspect of the Form Directive: the requirement that he and Vergara had to mutually consent to take future action to have the pre-embryos implanted in a surrogate.  Although Loeb argues Vergara verbally pressured him to sign the Form Directive at the clinic, he does not assert that absent such pressure he would not have participated in the IVF process that created the embryos at issue.  At most, Loeb presented testimony that he felt too embarrassed and humiliated to raise his desire for unilateral control, and he equates those feelings to duress.  Viewing the evidence in the light most favorable to Loeb, he has not raised a material factual issue on his duress defense, because Loeb concedes he was also motivated by the desire for the couple to undergo the IVF treatment with the clinic.  (*Broderick*, *supra*, 209 Cal.App.3d at p. 499 [no duress will be found if the moving party had mixed motives for agreeing to a contract].)  Even if Loeb felt he had no option but to sign the agreement if he wanted the IVF process to proceed, he has not shown that Vergara's conduct was intended to coerce him into seeking IVF.

Loeb's contention that he was suffering under duress fails for another reason.  There is no evidence that Vergara intended

25

to coerce Loeb to agree to the mutual consent provision. He claims that what was forced upon him was the language in the Form Directive requiring further mutual consent with Vergara to have the embryos implanted. But that is a provision that was presented by the clinic, not Vergara. To the contrary, Loeb has consistently maintained that he believed he and Vergara already had an oral agreement that gave him the authority to implant the embryos, regardless of the language of the Form Agreement. So even accepting Loeb's evidence of physical and verbal abuse, there is no evidence that the purpose of Vergara's words or actions was to induce Loeb to sign the mutual consent provision to his own detriment.

The record viewed in the light most favorable to Loeb does not establish a material dispute of fact that could support a finding of duress. Rather, Loeb's evidence at most suggests that he would or already had obtained everything he wanted by signing the agreement.

### 4. Duress and Law of the Case

Loeb argues that statements in the anti-SLAPP opinion (*Vergara v. Loeb*, *supra*, B286252) about his claims of duress precluded the trial court from summarily adjudicating his duress defense to Vergara's contract claims, purportedly under the law of the case doctrine. Loeb's contention has no merit.

Under the law of the case doctrine, when a prior appellate court opinion states a rule of law necessary to the decision of the case, the prior opinion " ' "conclusively establishes that rule and makes it determinative of the rights of the same parties in any subsequent retrial or appeal in the same case." ' " (*Leider v.*

*Lewis* (2017) 2 Cal.5th 1121, 1127.) "Generally, the doctrine of law of the case does not extend to points of law which might have been but were not presented and determined in the prior appeal. [Citation.] As an exception to the general rule, the doctrine is . . . held applicable to questions not expressly decided but implicitly decided because they were essential to the decision on the prior appeal." (*Estate of Horman* (1971) 5 Cal.3d 62, 73.) The doctrine "precludes a party from obtaining appellate review of the same issue more than once in a single action." (*Katz v. Los Gatos– Saratoga Joint Union High School Dist.* (2004) 117 Cal.App.4th 47, 62, see *Searle v. Allstate Life Ins. Co.* (1985) 38 Cal.3d 425, 434.)

The portions of the anti-SLAPP opinion Loeb now relies on appear in the context of our discussion of Vergara's malicious prosecution claim.[11] (*Vergara v. Loeb*, *supra*, B286252.) As we explained in the anti-SLAPP opinion, Vergara's malicious prosecution claim was based on Loeb's pursuit of the Santa Monica case, which he ultimately dismissed without prejudice. (*Vergara v. Loeb*, *supra*, B286252.) For Vergara's malicious

---

[11] Our anti-SLAPP opinion held Loeb's anti-SLAPP motion should have been granted, but only as to Vergara's malicious prosecution cause of action. Our anti-SLAPP opinion affirmed the trial court's decision to deny Loeb's anti-SLAPP motion as to Vergara's contract-based causes of action. The only defense to Vergara's contract-based claims considered in our prior opinion was the litigation privilege, which did *not* preclude Vergara from proceeding with those claims. The dissent took the position that the trial court's order denying Loeb's anti-SLAPP motion as to Vergara's breach of contract claims was also subject to reversal. (*Vergara v. Loeb*, *supra*, B286252 (dis. opn. of Kim, J).)

prosecution claim to survive Loeb's anti-SLAPP motion, she had the burden to show, among other things, that Loeb brought the Santa Monica case without probable cause. (*Sheldon Appel Co. v. Albert & Oliker* (1989) 47 Cal.3d 863, 871–872.) Focusing in on whether there was any evidence to support Vergara's allegation that Loeb filed the Santa Monica lawsuit without probable cause, we cited to caselaw explaining that the question of probable cause is a relatively low bar, examining whether the prior action was legally tenable, even if unlikely to succeed. (*Vergara v. Loeb*, *supra*, B286252.) Our opinion noted that Loeb's testimony about signing the Form Directive under duress was sufficient to meet the low bar required to avoid liability for malicious prosecution. In other words, Vergara could not show her malicious prosecution claim had minimal merit because she could not establish that the Santa Monica action was brought without probable cause. The anti-SLAPP opinion did not consider whether Loeb's evidence was sufficient to meet his burden, on summary judgment, to show there were material issues of disputed fact to support a duress defense to Vergara's contract-based claims. Because the matter was not considered, much less decided, in the prior opinion, it does not constitute law of the case.

### D.    *Oral Contract*

In connection with her cause of action for declaratory relief, Vergara asked the trial court to determine that there was no enforceable oral contract between Loeb and Vergara authorizing Loeb to implant the pre-embryos in a surrogate to be born.

Loeb argues on appeal that the trial court erred when it found no material factual issue on the oral contract question. In

28

addition, Loeb again raises the law of the case doctrine, in reliance on this court's limited mention of an Illinois appellate case—*Szafranski v. Dunston* (Ill.Ct.App. 2015) 34 N.E.3d 1132 (*Szafranski*)—in the anti-SLAPP opinion; Loeb contends this court's discussion of *Szafranski* constitutes a ruling that precluded summary adjudication of his oral contract defense.[12] We reject Loeb's arguments.

### 1.  Loeb's Oral Contract Contention of Error

Loeb's evidence on the existence and enforceability of an oral contract consisted solely of his own testimony and responses to interrogatories.  Describing this evidence in his opening brief, Loeb asserts that he and Vergara "agreed they were 'prolife,' supportive of the belief that life begins at conception, and that all of the embryos would ultimately be implanted in a surrogate and brought to term."  In addition, they agreed that Loeb would find a surrogate and that the embryos would be implanted "immediately."

The trial court noted that the only evidence of an oral agreement was Loeb's testimony (summarized above) and that the testimony was insufficient to support that the parties had an oral contract giving Loeb unilateral authority to seek to implant the pre-embryos in a surrogate.  The trial court cited *Mason v. Woodlawn Sav. & Loan Ass'n* (1967) 254 Cal.App.2d 41, 44, and

---

[12] Loeb's November 5, 2021 request for judicial notice relating to various non-California authorities is denied.  A court may consider cases from other states, and there is no need to take judicial notice of those cases.

*Weddington Productions, Inc. v. Flick* (1998) 60 Cal.App.4th 793, 811 for the propositions that contract terms must be sufficiently definite that the performance promised is reasonably certain, and that allegations that are too indefinite do not create a binding contract.  In particular, the trial court found the testimony about the oral agreement lacking specific terms for performance, including:  the timing of implantation of a pre-embryo (whether it was to be within six months, a year, or two years); the terms that would govern if a party changed his or her mind, or one of the parties died, or they separated; and the consequences of a breach, among other unaddressed issues.

In his opening brief, Loeb criticizes the trial court's decision, but fails to identify either a material factual issue or a legal theory under which assertion of an oral contract precludes summary adjudication in Vergara's favor.  Loeb does not discuss the legal authorities cited by the trial court; he does not cite to any other authorities regarding the specificity necessary for the parties to have come to an enforceable oral agreement; and he does not analyze or discuss his evidence as it relates to the law of contract formation.  Rather, Loeb argues only that the "issue[] of fact" that shows the trial court erred in granting Vergara's motion is encompassed in a question:  "Is An Oral Contract for Embryo Implantation Required to be More Specific Than a Written Contract?"  Loeb then asserts, without legal or factual analysis, that the Form Directive suffered from the lack of most of the same terms that the trial court found missing from the alleged oral agreement.

A brief must contain reasoned argument and legal authority to support its contentions or the court may treat the claim as waived.  (Cal. Rules of Court, rule 8.204(a)(1)(B); *People*

*v. Stanley* (1995) 10 Cal.4th 764, 793; *Bullock v. Philip Morris USA, Inc.* (2008) 159 Cal.App.4th 655, 685 ["An appellant must affirmatively demonstrate error through reasoned argument, citation to the appellate record, and discussion of legal authority"].) It is plain that what Loeb contends is a material issue of fact is not a factual issue at all. A jury could not be asked to answer the question Loeb poses. To the extent Loeb poses a legal question about potential differences between oral and written contracts, it is an abstract question that serves no purpose: he does not identify, discuss, analyze, or apply any law as it relates to the facts of the case or the trial court's ruling. Accordingly, we treat as waived Loeb's claims on appeal challenging the trial court's determination that there was insufficient evidence to raise a material factual issue on the existence of an oral contract granting Loeb exclusive control to implant the pre-embryos.

    2.  <u>California Law on Oral Amendments to a Written Agreement</u>

Even if we were to overlook Loeb's waiver, the ruling of the trial court must be affirmed. Vergara denies the existence of an oral agreement. But even if we were to assume that there is sufficient evidence of a factual dispute as to whether Loeb and Vergara reached an oral agreement prior to signing the Form Directive, any aspect of the oral agreement that would give Loeb unilateral control over the embryos was extinguished by the Form Directive's mutual consent requirement.

"A contract not in writing may be modified in any respect by consent of the parties, in writing, without a new consideration,

31

and is extinguished thereby to the extent of the modification." (Civ. Code, § 1697.)  In other words, even assuming Vergara and Loeb had orally agreed that Loeb had unilateral decisionmaking authority over the embryos' disposition, their purported oral agreement would have been extinguished when Loeb signed the Form Directive, in which he agreed that "[o]ne person cannot use the Cryopreserved Material to create a child (whether or not he or she intends to rear the child) without explicit written consent of the other person."  For this reason, Loeb fails to show that the trial court erred in determining that "[t]here is no triable issue of material fact that Loeb has an enforceable oral agreement with [Vergara] which authorizes Loeb to implant the embryos in a surrogate to be born."

### 3. Application of the Law of the Case Doctrine to the Oral Contract

Loeb argues that statements in the anti-SLAPP opinion, in particular our limited discussion of *Szafranski*, *supra*, 34 N.E.3d 1132, precluded the trial court from summarily adjudicating his oral contract defense to Vergara's claims under the law of the case doctrine.  We disagree.

*Szafranski,* 34 N.E.3d 1132, was an Illinois appellate opinion holding that in the absence of a written agreement providing for disposition of embryos in the event of the parties' separation, the available extrinsic evidence supported an interpretation that the parties never intended to be bound to a particular disposition of the embryos when they signed a consent form that—like the Form Directive at issue in the current case—

provided "'no use can be made of these [pre-embryos] without the consent of both partners.'" (*Id.* at pp. 1138, 1157.)

As with in our discussion of the law of the case doctrine in connection with the issue of duress, the discussion of *Szafranski* in our prior opinion only concerned Vergara's claim for malicious prosecution, and whether Vergara could meet her burden to show that Loeb had no tenable legal basis for filing his Santa Monica action. Although *Safranski* was decided by an Illinois appellate court, in the absence of controlling California law to the contrary, we determined that Loeb had a good faith legal basis for contending that the Form Directive's language did not preclude him from arguing for control of the pre-embryos. (*Vergara v. Loeb, supra,* B286252.) We made no determination about the ultimate merit of Loeb's claims in the Santa Monica lawsuit; nor did we assess whether his evidence in support of the existence, meaning, and enforceability of a purported oral contract could survive a motion for summary adjudication. We only determined that Vergara could not show Loeb's filing of the Santa Monica action lacked probable cause for want of a tenable legal basis.

In addition, we note that different states have taken varying approaches to the issue of how to balance the competing rights of parents when a dispute over custody of frozen pre-embryos arises. (See, e.g., 2 Haralambie & Quinn, Handling Child Custody (2021) Abuse and Adoption Cases, § 9:8:50 [disposition of unused frozen embryos, reviewing various state cases].) While we noted the existence of *Szafranski* to explain why Loeb's claims had a tenable legal basis, we had no need to consider or decide—expressly or implicitly—how a California appellate court would determine whether a contributor of genetic material could, based on an oral agreement, successfully assert

33

control over the embryos created by that genetic material, regardless of the other party's opposition.  That was not the question we were asked to decide in the prior appeal, and it is not the question we are being asked to decide in the current appeal either.

### E.  *Terms of Injunctive Relief*

In its judgment, the trial court permanently enjoined Loeb from using the pre-embryos to create a child without Vergara's express written consent, either notarized or appropriately witnessed.  The court's injunction, on this issue, precisely tracks the language of the Form Directive that Loeb and Vergara signed.  The judgment further provides a listing of conduct encompassed in the prohibition against Loeb using the pre-embryos to create a child.  Loeb is specifically enjoined from taking unilateral actions "by" or "on behalf" of the pre-embryos that are clear steps toward creating a child, including bringing the pre-embryos to term, having the pre-embryos seek to give Loeb exclusive custody, having the pre-embryos seek standing for and filing suit.

On appeal, Loeb appears to contend that these provisions are contrary to our anti-SLAPP opinion, or otherwise impermissibly burden Loeb's own access to the courts.  Loeb's contentions have no merit.  In our prior opinion, we explained the distinction between (a) Loeb accessing the courts on his own behalf and (b) Loeb making unilateral decisions for or on behalf of the pre-embryos, or causing the pre-embryos to take litigation positions favorable to Loeb.  Far from running contrary to reasoning of the prior opinion, the trial court's judgment hews

34

carefully to this important distinction.  Loeb's additional points—
that he is "dutybound" to act for the pre-embryos because
Vergara will not give her consent pursuant to the Form Directive
to bring them to term and will not abide by the parties' alleged
oral agreement—fail for the reasons we have already discussed.

## DISPOSITION

The judgment is affirmed.  Costs on appeal are awarded
Sofia Vergara.

NOT TO BE PUBLISHED.

MOOR, J.

We concur:

RUBIN, P. J.

KIM, J.